In the matter of Mason.

---

SAME TERM. *Before the same Justice.*

In the matter of JOHN MASON.

The reason of the greater strictness which prevails in the English court of chancery in relation to the form of the inquisition upon a commission in the nature of a writ *de lunatico inquirendo*, has no connection, *it seems*, with the question of jurisdiction. But it is to be found in the fact that by the English statutes, the party who, by an inquisition, has been found to be a lunatic, or person of unsound mind, has a right to traverse the finding of the jury.

Here, the right to traverse the inquisition does not exist; and therefore there is not the same reason for insisting upon a particular form in the finding of the jury.

By the statute of this state, the care and custody of the persons and estates of lunatics, idiots, &c., is confided to the court of chancery, without any restriction or limitation. The manner in which the control thus given is to be exercised, is entirely a matter of discretion. The form of the return to the inquisition is only important so far as it is necessary to satisfy the conscience of the court.

If enough appears upon the inquisition to enable the court to adjudge the party to be within some one of the classes of persons over whom the statute has given it jurisdiction, it is sufficient.

In the matter of Mason.

It is enough to give the court jurisdiction if the jury find that the party is mentally incapable of governing himself, or managing his affairs.

Yet *it seems* it is better to adhere to the technical form of finding in the language of the statute itself.

IN EQUITY.　In December, 1839, Isaac Jones, George Jones, and Andrew G. Hamersley, executors of the last will and testament of John Mason deceased, presented to the vice chancellor of the first circuit a petition, stating that John Mason, a son of John Mason deceased, was, and for several years had been, so far deprived of his reason and understanding, that he was rendered entirely unfit and unable to govern himself, or to manage his affairs; and praying that a commission in the nature of a writ *de lunatico inquirendo* might be issued, to inquire of his lunacy; and thereupon a commission in the usual form was issued.　Upon the execution of the commission, the jury returned, by their inquisition, "that the said John Mason, jun. is so far weakened and impaired in the faculties of his mind as to be mentally incapable of the government of himself, and of the management of his goods and chattels, lands and affairs; and that he has been so incapable for the space of four years now last past; but how, or by what means, the said John Mason became incapacitated, the jurors aforesaid know not, except it be sickness and the visitation of God."　On the coming in of the inquisition, the vice chancellor, regarding the finding of the jury as informal, if not insufficient, (as appears from the report of the case in 3 *Edw. Ch. Rep.* 380,) directed that a copy of the inquisition, with notice of the motion for a committee, should be served on the party alleged to be of unsound mind, and that the person making such service should explain to him the nature of the inquisition, and the object of the notice, and apprise him that if he, or his friends, thought fit so to do, opposition could be made to the application for the appointment of a committee.　Upon the hearing of the motion for a committee, it was shown that a copy of the inquisition and notice had been served as required, and that Mason stated to the person making such service that he was incompetent to take charge of himself or his property, and that he wished to have Isaac Jones ap-

pointed for that purpose. The usual order of reference was then made, to report suitable persons to be appointed a committee, the amount of security to be given, and the amount which should be allowed for the support of the person alleged to be of unsound mind. And upon the coming in of the report, an order was made, on the 16th of April, 1840, appointing Isaac Jones, a brother-in-law, and Rebecca Jones, a sister of Mason, his committee, and directing an allowance of two thousand dollars per annum for his support.

A petition was presented by James Mason, a brother of John Mason, alleging that the inquisition upon which the order for the appointment of a committee was founded, was illegal and insufficient to justify or support the proceedings, and praying that the inquisition and subsequent proceedings might be set aside. It was also alleged in the petition, that the committee, by reason of their direct pecuniary interest in the estate of Mason, and also by reason of the grossly neglectful manner in which they have exercised their powers as his committee, are unfit and unsuitable persons to be entrusted with the charge and care of his person or estate; that they had neglected and refused to file any account of their receipts and expenditures, and had refused to expend, for his care and comfort, more than $500 annually; and further, that his health and happiness, if not his life, required his immediate removal from the custody of his committee; and it was asked that an examination might be had in respect to the management of the estate and person of Mason, by his committee.

John Mason himself also presented a petition, in which he stated that since April, 1840, he had been in the custody of his committee—that he had long been desirous of being restored to the enjoyment of his personal liberty and his estate, but that in consequence of his being feeble in strength of body and mind, he had continued to submit to their deprivation. He asked that he might have the privilege of choosing where he might live, and in what manner his own money might be expended for his benefit.

In opposition to the application, the affidavit of the commit-

---

In the matter of Mason.

---

tee, and several near relatives of Mason, together with his nurse and attending physician, were produced, disproving the allegations of neglect and improper treatment, and showing that due exertions had been made by the committee to promote the comfort and health of their charge.   It was also shown by the affidavit of Dr. McDonald, a physician who has for many years devoted himself to the study and treatment of cases of mental weakness and disease, that Mason was still a person of unsound mind, and unfit and unable to govern himself, and to manage his affairs, and take charge of his property.

*J. J. Ring*, for the petitioner.

*M. S. Bidwell & D. Lord*, for the committee.

HARRIS, J.   Upon the hearing of this motion, the counsel, by whom it was argued on behalf of the petitioners, very properly, I think, abandoned the ground that the committee should be removed on account of misconduct or inattention to the duties of their trust, and relied entirely upon the insufficiency of the return of the jury, upon the taking of the inquisition, to sustain the proceedings.   The question now to be determined relates, therefore, solely to the regularity of the proceedings which resulted in the appointment of the committee.

The earlier chancellors of England, in the exercise of their jurisdiction over persons incapable of taking care of themselves, confined themselves to cases of strict idiocy and lunacy.   Accordingly, Lord Hardwicke, in the case *Ex parte Barnsley*, (3 *Atk.* 168,) held an inquisition which found that the alleged lunatic, from weakness of mind, was incapable of governing himself, or his estate, to be insufficient.   In that case, the Lord Chancellor remarked, that he was glad to find, upon search, that except in two or three instances, the return had been *lunaticus*, or *non compos mentis*, or *insanæ mentis ;* or, since the proceedings have been in English, of *unsound mind.*   He added, that he desired they should continue so, or otherwise it would introduce *great uncertainty.*

In the matter of Mason.

About the same time, the same chancellor quashed a return which found the alleged lunatic not of sufficient understanding to manage his own affairs; and another in which the jury found him to be " Worn out with age and incapable of managing his own affairs." At a later day, the decision of Lord Erskine in the case *Ex parte Cranmer*, (12 *Vesey*, 445,) gave a more enlarged and extended jurisdiction to this paternal care of the court; and he held that it embraced cases of imbecility resulting from old age, sickness, or other causes. The question, he said, was whether the party had become *mentally incapable of managing his affairs*. In a previous case, Lord Eldon had decided that it was not necessary, in support of a commission in the nature of a writ *de lunatico inquirendo*, to establish lunacy; but it was sufficient if the party was shown to be *incapable of managing his own affairs*. And yet, in all these cases, it was held to be necessary that the jury should find unsoundness of mind; which Lord Hardwicke seems to have understood as correspondent with lunatic, and which Lord Eldon defined to be " such a state of mind as to be contradistinguished from idiocy, and also from lunacy, and yet such as made one a proper object of a commission in the nature of a commission to inquire of idiocy or lunacy."

The reason of this strictness in relation to the form of the inquisition seems not to have had any connection with the question of jurisdiction. On the contrary, we find the English chancellors repeatedly asserting their jurisdiction over all persons who, from age, infirmity, or other misfortune, are incapable of managing their own affairs; while at the same time they hold the finding of the jury upon the execution of the commission insufficient, unless it includes unsoundness of mind. I think the reason of this strictness is to be found in the fact that, by the English statutes, the party who, by an inquisition, had been returned a lunatic, or of unsound mind, had a right to traverse the finding of the jury. It was important, therefore, that there should be no uncertainty in the form of the finding; as it might become the subject of an issue, upon the traverse. But here, the right to traverse the inquisition does not exist, and

therefore there is not the same reason for insisting upon a particular form in the finding of the jury.

By the statute of this state, the care and custody of the persons and estates of lunatics, idiots, persons of unsound mind, and habitual drunkards is confided to the court of chancery, without any restriction or limitation. The manner in which the control thus given is to be exercised is entirely a matter of discretion. The form of the return to the inquisition is only important so far as it is necessary to satisfy the conscience of the court. If, upon the coming in of the inquisition, enough appears to enable the court to adjudge the party to be within some one of the classes of persons over whom the statute has given it jurisdiction, it is sufficient. A discreet exercise of the power vested in the court undoubtedly requires that before a citizen shall be deprived of his liberty, and the control of his own property, evidence of the most conclusive character should be produced, showing him to be a person for whose benefit the law has benignly provided this delicate and important trust. But I am not prepared to say that a case might not be presented to the court in which the evidence would be so clear and satisfactory as to justify the exercise of its summary power, for the protection of a party, without the intervention of a jury. Whether this be so, or not, I cannot doubt that under the law of this state, it is enough to vest the court with jurisdiction of the case when, as in the case under consideration, the jury find that the party is mentally incapable of governing himself, or managing his affairs. Chancellor Kent seems to have thought so, when in the case of *Barker*, (2 *John. Ch.* 232,) he directed a commission to issue to inquire whether the party was of unsound mind, or mentally incapable of managing his affairs. It is quite evident that in giving this direction, that learned jurist understood the two terms, "unsound mind," and mentally incapable of managing his affairs, as meaning substantially the same thing, and that the use of either phrase in the inquisition would furnish sufficient ground to justify him in proceeding to the appointment of a committee. It is true, that in the case referred to, the jury found that Barker was of unsound mind,

AND mentally incapable of managing his affairs; yet from the form of the order directing the commission to issue, it is plainly inferable that no force was added to the return of the jury by adopting both phrases. Indeed, looking at both terms in their plain and obvious sense, I cannot but regard the expression " mentally incapable of governing himself or managing his affairs," as necessarily embracing all that is understood by the term " unsound mind," and perhaps more. In the case of *Wendell*, (1 *John. Ch.* 600,) the same learned chancellor also directed an issue to be made and settled to try the question, whether Wendell " be a lunatic OR mentally incapable of managing his own affairs;" thus showing that the alternative form of the order was not a mere matter of inadvertence, but that it was deliberately adopted. I agree with Chancellor Walworth in the opinion expressed by him in the matter of *Morgan*, (7 *Paige*, 236,) that it is not wise to depart from the technical form of finding in the language of the statute itself; although, as I have already attempted to show, the same reason which has induced the English court of chancery to confine the jury to the technical expression of unsoundness of mind, does not exist here. It might, perhaps, have been better, in the case now before the court, if the vice chancellor had required a further inquisition; and yet I cannot say that, under the circumstances as they appeared, it was an indiscreet exercise of his undoubted power. However that may be, it was a question of discretion, and not of jurisdiction, and if the vice chancellor erred his error could only have been corrected by appeal. The motion to set aside the proceedings must therefore be denied.

Nor can I say, from any thing before me, that the committee have omitted any thing which would have in any degree contributed to the comfort or happiness of the afflicted individual committed to their charge, or that in any respect they have been unfaithful to their trust. So far from this, they have, I think, fully and satisfactorily met every allegation in the petition, charging them with improper conduct in the management of the person or estate entrusted to their guardianship. A careful examination of the case has confirmed the impression made

In the matter of Mason.

upon my mind on the argument, that the committee had discharged the delicate duties assigned them, with commendable humanity and faithfulness. At the same time, I am inclined to believe it may not be an indiscreet exercise of the supervisory power of the court to direct a further examination to be had in the case. · In the discharge of this important branch of its trusts, the court cannot guard too sedulously the welfare of that unhappy class of persons, who, incapable of taking care of themselves, have been committed to its care. I can but hope too, that a reference judiciously conducted, may tend to allay any apprehensions, unfounded as I think they are, which are now entertained by any of the relatives of this unfortunate man, that his comfort is not sufficiently cared for by his committee. I shall, therefore, direct that it be referred to Murray Hoffman, Esquire, or if he shall decline to act as such referee, then to such other person as may be agreed upon by the counsel for the parties, to inquire into the personal condition of this person, and particularly whether or not he has been treated in a due and proper manner by his committee; also whether any greater freedom or indulgence can be granted to him with safety, and whether any change in his situation or mode of life would be conducive to his comfort; also to inquire whether the allowance made for his support, has in good faith been expended for his benefit: to the end that upon the coming in of the report, any further direction may be given which may then be deemed proper. The order should also contain a provision authorizing the referee, and such other persons as he may think proper, to have free access to Mason for the purpose of personal examination, and if the referee shall so direct, that he be present upon the execution of the reference. The costs of the reference must, in the first instance, be paid by the petitioner, James Mason, unless the committee shall elect to have a provision inserted in the order for passing their accounts. In that case, the costs of the reference may be paid out of the estate in the hands of the committee. Otherwise, it must depend upon the result of the examination, and the report of the referee, whether the estate shall bear the expense of the reference.