(57 Misc. Rep. 670.)

### In re LEWIS.

(Supreme Court, Special Term, Kings County. February, 1908.)

1. INSANE PERSONS—INQUISITION—STATEMENT OF COMMISSIONERS.

In a proceeding for the appointment of a committee of an alleged incompetent, where jurors find the fact of lunacy and the inquisition is signed by the commissioners, a statement attached to the inquisition, reciting that two of the commissioners do not concur with the finding of the jury, does not affect the validity; Code Civ. Proc. §§ 2328, 2331, and 2332, providing for a finding by the jurors, and the signing by the commissioners of the finding being mandatory, whatever their views may be.

2. SAME—EVIDENCE—CONFIRMATION OF INQUISITION.

On an inquisition in lunacy, the jurors retired at about noon on Saturday morning, and were kept together without agreement until noon on Sunday, at which time they found the alleged incompetent to be sane. Held that, the evidence overwhelmingly establishing the insanity of such incompetent, the inquisition would not be confirmed.

In the matter of Mary E. Lewis, an alleged incompetent. Proceedings for the appointment of a committee. Motion to confirm inquisition denied.

Hyacinthe Ringrose, for the motion.
Otto Horwitz and Thomas T. Sherman, opposed.

CARR, J. In this matter an order was entered directing the issuance of a commission to take an inquisition into the alleged insanity of one Mary E. Lewis. Three commissioners were appointed, and a sheriff's jury of 14 jurors was impaneled. The commissioners and jurors sat for two months and took testimony which covers more than 3,000 pages of the stenographer's minutes. The inquisition is returned, signed by 12 jurors and the 3 commissioners. The finding of the 12 jurors is that said Mary E. Lewis is not insane and is competent to take care of her person and property. The commissioners attach to the inquisition a statement which recites that two of them do not concur with the finding of the jury, but, on the contrary, believe Miss Lewis to be incompetent by reason of insanity, while the third commissioner states his concurrence with the findings of the jury. The matter now comes before the court on a motion to confirm the inquisition and to dismiss the proceedings.

It is urged, first, in opposition to the motion that, because of the dissent of the two commissioners, there has been no executed inquisition and that the proceedings have resulted practically in a mistrial. This contention rests upon the claim that a concurrence with the findings of the jury by at least a majority of the commissioners is essential to make up a complete inquisition. No authorities are cited in which this proposition has been declared. After a somewhat exhaustive search in text-books, digests, and other sources, I can find none myself. Precedents may be found in which the courts have passed on the merits of certain returns in proceedings of this nature, where the commissioners have dissented from the findings of the jury, but without in any way expressing any opinion on the question of whether the concurrence of the commissioners was necessary to a complete inquisition. Matter of Lasher, 2 Barb. Ch. 97; Matter of Preston, 43 Misc. Rep. 550, 89 N. Y. Supp. 517. There is certainly nothing expressed in the Code of Civil Procedure which makes such concurrence a requisite part of the proceedings; nothing in the old Code, nor the provisions of the former statutes; nothing in the old chancery practice as to the execution of writs de lunatico inquirendo, of which the present Code provisions are but statutory declarations, with some changes as to form.

A brief inquiry into the nature and history of proceedings of this character may be advisable. In England the care of the person and property of incompetents was a part of the rights and duties of the king. These rights and duties were exercised through the Chancellor, as the representative of the king's conscience. The Court of Chancery, before taking over the custody of the person or property of an incompetent, ordered an inquiry into the facts of the alleged incompetency, through the old writ of de lunatico inquirendo. Ordinarily a sheriff's jury was impaneled to hear the testimony and to have a personal inspection of the alleged incompetent. The jury made its return to the Chancellor, stating its conclusions. This return was in no way conclusive upon the court, which was free in its discretion either to confirm the findings or order a new inquiry, or, as happened in some instances, to make its judgment even against the findings of the jury, without a new inquiry. The commissioners appointed by the court presided over the inquiry by the jury, preserved order, and passed upon all questions of law which arose during the proceeding, until the inquiry was completed. It was no part of their duty, nor in their power, to determine any question of fact, where a jury had been selected.

This practice was adopted in this state, and our old Court of Chancery proceeded practically along the same lines as its English predecessor. In the course of time the practice of the court became recognized and declared in various statutory provisions, enacted and reenacted from time to time in the Revised Statutes, the former Code, and our present Code of Civil Procedure. Section 2328 of the Code of Civil Procedure prescribes the contents of the commission as follows:

"The commission must direct the commissioners to cause the sheriff of a county, specified therein, to procure a jury; and that they inquire, by the jury, into the matters set forth in the petition," etc.

Section 2331 regulates the proceedings upon the hearing and provides, in part, as follows:

"At least twelve jurors must concur in a finding. If twelve do not concur, the jurors must report their disagreement to the commissioners, who must thereupon discharge them," etc.

Section 2332 regulates the return of the inquisition as follows:

"The inquisition must be signed by the jurors concurring therein, and by the commissioners, or a majority of them and annexed to the commission."

If 12 jurors concur in a finding, then a finding has been made, and the inquisition must be signed by the jurors whose concurrence makes the finding. The signing by the commissioners is made mandatory, whatever be their views as to the jury's finding. This is so, because the signing by the commissioners is prescribed simply for authentication by them of the regularity of the inquisition, and not as to merits of the jury's determination. There is no question in my mind but that a regularly and completely executed inquisition is now before the court on this motion.

The question of a confirmation of the findings by the jury is one which rests entirely in the discretion and conscience of the court. Matter of Lasher, 2 Barb. Ch. 97; Matter of Mason, 1 Barb. 436; Matter of Rogers, 9 Abb. N. C. 141; Matter of Cooper, 5 N. Y. Law Bul. 38; Matter of Preston, 43 Misc. Rep. 550, 89 N. Y. Supp. 517. Whenever the court has found the decision of the jury, in proceedings of this kind, against the weight of evidence, it has not hesitated to set aside the inquisition. Of course, it should not be lightly done, especially in a case like this, where so great an expenditure of time and money has taken place. A reading of the overvoluminous record of this inquisition shows that it was conducted "without regard to expense," either of time or money. The stenographer was as scrupulous as the Recording Angel, and not an idle word of counsel escaped him. For the benefit of posterity the summing up of counsel was taken and transcribed.

The proceedings opened on October 15th and ended on December 18th. In the course of the trial the jurors grew so proficient in the law that on December 13th we find them instructing the commissioners on the proper conduct of the case. One of them, a veritable "sea lawyer," is afraid that "this case will be a mistrial" if a wholly unnecessary thing be not done. The commissioners are again informed by a juror that "the order [appointing the commissioners] puts it up to you," the commissioners, to decide upon a point raised by counsel. On December 14th, the jury retired at 11:50 o'clock in the morning. At 3:30 p. m. they came into court for further instructions. At 4:10 p. m. they asked further advice. At 5:30 p. m. the commissioners directed the sheriff to inquire from the jury "if there is any prospect of their agreeing before the next hour." At 10:20 p. m. they were brought into court and asked if they wished any further instructions. They said that they did not. It was a Saturday night. The

jury were anxious to know if they would be locked up over Sunday. They were informed that no verdict would be taken on a Sunday. At 11:50 p. m. they were again brought into court and asked if they had agreed. They said they had not. At 12:15 a. m. they returned to court and said they had not agreed, and one of the jurors indulged in some reflections upon the mental processes of some of his associates. They then retired, but returned again at 12:45 a. m. and said they had not agreed. At 12 o'clock midday, on Sunday, they came into court and rendered the verdict which is now before the court. It seems to this court that there was a little too much of a hothouse process adopted to secure a verdict from this jury. The prospect of being confined in Borough Hall over Sunday was enough to shake the determination of an average man. The constant inquiry as to their acts may well have coerced many of them into mere acquiescence, where agreement freely arrived at was the desired result.

The evidence discloses a very sad condition as to Miss Lewis. She is now 62 years of age. For the greater part of her lifetime she has been under restraint in various asylums as a person of unsound mind. Her mental trouble seems to have begun in her girlhood, shortly after she arrived at puberty. She came of a good family, and was surrounded with every reasonable luxury. While her father lived, she was the object of his tenderest care. At his death he made ample provision for her support. During a period of 35 or 36 years her conduct has been such, from time to time, as to indicate a very unbalanced mind. It is unnecessary to go into a recital of the details which justify this conclusion. It was the argument of her counsel before the jury, and later before this court, that the unfortunate woman's past disability was due to menstrual irregularity, but that, now that she has had a "change of life," her condition has improved. This would be a happy result, were it so. I cannot concur in the findings of the jury that it is so. To my mind, the evidence tends overwhelmingly to the contrary. Her letters, postal cards, and her answers on the witness stand show that her mind is beclouded with ideas of persecutions, fierce hatreds, and an inability to appreciate her real condition. A few years ago she annoyed her relatives by a series of abusive and vile postal cards sent through the mail. This led to a criminal prosecution, which was suspended through the consent of the injured parties. She now expresses her sorrow for that performance, principally on the ground that her conduct was said to be disloyal to the government. Her later letters are most cogent proof of mental unsoundness. They breathe the delusions of persecution. They are filled with wildly abusive epithets, and are written in a handwriting betraying constantly increasing excitement, ending in almost complete illegibility. In view of the course which I am about to take, I do not deem it desirable to further discuss the proofs taken before the commission.

The motion to confirm the inquisition is denied. Let an order be presented on notice, settling questions for a new inquiry at a Trial Term of this court. In dispensing with a commission and directing the trial to proceed at a Trial Term of this court, there is no desire to reflect in any way upon the gentlemen who composed the present

commission. The record shows that they have conducted themselves with commendable courtesy, patience, and a high degree of skill, and deserve the thanks of the court therefor.