De Hart v. Condit.

---

CHARLES A. DE HART, appellant,

*v.*

SARAH D. CONDIT, respondent.

1. A statute directing that a commission *de lunatico inquirendo* shall be executed before a jury of twelve men, is constitutional.

2. The fact that only part of the jurors visited the alleged lunatic for personal examination of him, is not sufficient ground for setting aside the inquisition.

3. If the jury find in favor of the incapacity of the alleged lunatic, and, upon examination of the proceedings, there appears to be a reasonable doubt as to the propriety of their finding, he should be allowed to traverse the inquisition.

---

On appeal from an order of the chancellor denying the petition of the appellant, as stated below, and from the decree confirming the inquisition.

*Mr. John Whitehead*, for the appellant.

*Mr. James E. Howell*, for the respondent.

The opinion of the court was delivered by

DIXON, J.

Upon a petition presented to the chancellor in June, 1892, a commission in the nature of a writ *de lunatico inquirendo* was

issued, to ascertain whether Charles A. De Hart was a lunatic or of unsound mind, and in the following month an inquisition was returned into chancery, finding that Mr. De Hart was then, and for the space of about five years preceding had been, of unsound mind, so as to be incapable of governing himself, his lands, tenements, goods and chattels. Within a few days Mr. De Hart presented to the chancellor a petition asking that the inquisition be set aside, or, in case that should be refused, that he be permitted to traverse the inquisition. In December, 1892, the chancellor made an order denying these requests and affirming the proceedings taken upon the commission. From that order Mr. De Hart appeals to this court.

The grounds upon which counsel for the appellant contends in this court that the inquisition should be set aside are (1) that the jury consisted of but twelve men, and (2) that of these only eleven attended at a personal inspection of the alleged lunatic, although all the twelve concurred in the finding.

An act concerning idiots, lunatics &c., approved March 23d, 1887 (*P. L. of 1887 p. 48*), directs the sheriff to summon only twelve jurors, instead of twenty-four, to inquire into and find the truth of the matters involved in a commission relating to the competency of such persons. But it is insisted that this act violates the right of trial by jury as guaranteed by the constitution.

If we assume that the constitutional provision applies to proceedings of this nature, still this statute does not infringe upon it, for the reason that, prior to the adoption of the constitution, the party had no right to trial by more than twelve jurors.

" By the old common law," says Blackstone (*1 Black. Com. 303*), " there is a writ *de idiota inquirendo*, to inquire whether a man be an idiot or not, which must be tried by a jury of twelve men ;" and (*p. 305*) " the method of proving a man *non compos* is very similar to that of proving him an idiot." In speaking of inquisitions or inquests of office generally, the same author says (*3 Black. Com. 258*) that the inquiry is made " by a jury of no determinate number, being either twelve or less, or more." The sufficiency of twelve men to constitute a jury in such cases

is asserted by other writers on the subject (*Coll. Lun. 153; Shelf. Lun. 117; Bush. Insan. § 63*), and was adjudged by the chancellor in *Lindsley's Case, 1 Dick. Ch. Rep. 358*. In practice, any number not less than twelve nor over twenty-three has been considered adequate. In *Ferne's Case, 5 Ves. 450*, seventeen jurors; in *Dey's Case, 1 Stock. 181*, twenty-three jurors, and in *Van Auken's Case, 2 Stock. 186*, twenty-one jurors, were sworn.

The inquisition should not be disturbed on this ground.

Nor should the fact that only eleven jurors visited Mr. De Hart for personal examination defeat the finding. The presence of all the jurors at such an examination is not necessary. *Smith's Case, 1 Swanst. 4, 6; Child's Case, 1 C. E. Gr. 498, 499.*

The question whether the alleged lunatic should be allowed to traverse the inquisition must next be considered.

As pointed out by the chancellor in *Lindsley's Case, 1 Dick. Ch. Rep. 358*, the traverse of such an inquisition was, in England, deemed a matter of right under the statute *2* and *3 Edw. VI. c. 8*, and, on an application of the alleged lunatic to traverse, the duty of the court consisted merely in ascertaining that the application was an act of the free will of a person capable of forming and expressing such a volition. *In re Cumming, 1 De G., M. & G. 537*. But, that statute not having been adopted in the United States, the right was here denied at an early day. In *Wendell's Case, 1 Johns. Ch. 600*, Chancellor Kent said: "The care and custody of idiots and lunatics being confided to this court, the whole control of the inquisition and the manner in which that control should be exercised would seem to depend entirely on the discretion of the court." In New Jersey, by a statute passed November 21st, 1794 (*Pat. L. p. 125*), it was enacted that the chancellor should have the care and provide for the safe keeping of all idiots and lunatics and of their lands and tenements, goods and chattels; and it is probable that upon this statute was founded the practice in this state of regarding the application to traverse, just as Chancellor Kent regarded it on similar grounds in New York, as addressed to judicial discretion. *Covenhoven's Case, Saxt. 19; Van Auken's Case, 2 Stock. 186; James' Case, 9 Stew. Eq. 547*. According to this

De Hart v. Condit.

practice, if there be a reasonable doubt as to the petitioner's unsoundness of mind, the traverse should be allowed. *Russell's Case, 1 Barb. Ch. 38,* and New Jersey cases last cited.

It appears that, at the time of the inquisition, in July, 1892, Mr. De Hart was in his eighty-second year; that in the year 1887 he had a slight stroke of apoplexy, after which he exhibited a marked lack of memory, especially with regard to recent occurrences; that, up to April, 1892, he had been a member of a firm engaged in the business of manufacturing edged tools, which, however, for four or five years preceding, had been chiefly carried on by his partners; that, nevertheless, he had been generally consulted about the partnership affairs as long as the firm continued, and in March, 1892, had taken an active and decisive part in negotiating the sale of his interest in the business; that at no time had it been suggested among his friends that his personal liberty should be restrained; and that he had always, in his household and neighborhood, been treated as an intelligent person, quite capable of forming and expressing rational opinions on matters discussed in his presence.

Under these circumstances, we think there is reasonable doubt whether the infirmity of his memory is such as to indicate that unsoundness of mind which renders one unfit for the government of himself as well as of his property, and without which the courts are not justified in placing a man and his estate under guardianship. *Lindsley's Case, 17 Stew. Eq. 564.* In old age, inability to attend to the details of business, arising from defective memory and similar causes, is to be expected, but it is protected from serious loss more humanely by the ministrations of friends than by legal proceedings, which virtually take away the rights of property and of self-government.

The order of the chancellor should be reversed and the case remitted, with directions that the appellant be permitted to traverse the inquisition.

*For reversal*—ABBETT, DEPUE, DIXON, GARRISON, LIPPINCOTT, REED, VAN SYCKEL, BOGERT, KRUEGER, PHELPS, SMITH—11.

*For affirmance*—None.