FRANK SPORZA, as Committee of the Estate of IDA JETTER, an Incompetent Person, Respondent, *v.* THE GERMAN SAVINGS BANK IN THE CITY OF NEW YORK, Appellant.

1. COURTS — POWER TO CORRECT IMPROPER SPELLING OF NAME IN PRE-VIOUS ORDER.  Where in a proceeding under section 2323a of the Code of Civil Procedure, a committee of the estate of an incompetent person has been appointed, which committee, after duly qualifying, makes demand for the payment of a sum of money on deposit in a savings bank to the credit of the incompetent which is refused upon the ground that the incompetent's name was improperly spelled, the court has power, upon application, to make an order correcting the spelling of the name by stating the various names under which the said incompetent had been known.

2. INCOMPETENT AND INSANE PERSONS — JURISDICTION OF STATE OVER SAME — FORMERLY ENTRUSTED TO COURT OF CHANCERY.  Jurisdiction is inherent in the state over unfortunate persons within its limits who are idiots or have been deprived of the use of their mental faculties, and it is its duty to protect the community from the acts of those persons who are not under the guidance of reason, and also to protect them, their persons and property, from their own disordered and insane acts.  During the early history of the state and at the time the provision to the effect that a trial by a jury in all cases in which it has heretofore been used shall remain inviolate forever was first incorporated into our Constitution (N. Y. Const. art. 1, § 2), the care and custody of lunatics and incompetent per-

sons, which was vested in the people of the state, was entrusted to the chancellor and Court of Chancery and the proceedings with reference to the detention and confinement of insane persons, the determination of the question of their insanity and the appointment of a committee therefor, were largely in the discretion of the chancellor, but the custom prevailed on his part, in order to inform his conscience, to require a trial by jury of the question of the insanity of a person, in all cases of doubt, in proceedings taken with reference to his commitment and to the disposal of his property.

3. Same — Proceedings for Examination and Commitment of Insane Persons — Right of Alleged Lunatic to Trial by Jury — Insanity Law (L. 1896, Ch. 515). Since 1842 the proceedings for the determination of lunacy and the commitment of insane persons have been governed by various legislative enactments, culminating in the Insanity Law (L. 1896, ch. 545). By the express provisions of that statute, the right to a trial by jury is preserved to every individual committed to a state hospital, upon his demand or that of any friend in his behalf, the statute providing that in proceedings to commit a person to an asylum, a notice to the alleged insane person must be given, unless it is made to appear that the giving of such notice might be injurious or dangerous to such person, and that if a final order is made, finding insanity and directing commitment, the alleged incompetent, or any friend in his behalf, in case they are dissatisfied with the determination made, may appeal to a justice of the Supreme Court, other than the one making the order, who shall cause a jury to be summoned and try the question of such insanity.

4. Incompetent Persons — Wards of the State and of the Supreme Court — Care of Property of Incompetent. An incompetent person, who has been lawfully committed to a state hospital for the insane under the provisions of the Insanity Law, becomes a ward of the state, and also of the Supreme Court, which having succeeded to the powers of the Court of Chancery, has the power, from time to time, to inquire as to the continuance of the insanity and also to take in charge the care and preservation of the incompetent's property.

5. Constitutional Law — Section 2323a of the Code of Civil Procedure Not Violative of Section 1 of 14th Amendment of Federal Constitution. Where, in a proceeding under section 2323a of the Code of Civil Procedure, providing for the appointment of a committee of the estate of an inmate of a state hospital for the insane, upon the petition of a state officer, the court appoints a committee of the estate of such an inmate, a contention in an action by such committee to recover certain property of the incompetent, that the provision of the Code in question is violative of section 1 of the 14th Amendment of the Federal Constitution providing that no state shall "deprive any person of life, liberty or property, without due process of law," cannot be sustained, where the incompetent had been duly committed in accordance with the provisions of the statute, upon an order of the court, since her commitment involved

a judicial determination, which is a compliance with the Constitution, and, therefore, she is not deprived of her liberty without due process of law, and as the court in the proper exercise of its authority undertakes the care and management of her property, in her behalf and for her benefit, she is not deprived thereof.

6. Constitutional Law — Section 2323a of the Code of Civil Procedure Not Violative of Section 2 of Article 1 of State Constitution. Nor can a contention be sustained, in such an action, that the provision of the Code in question is violative of section 2 of article 1 of the State Constitution which provides that "the trial by jury in all cases in which it has been heretofore used shall remain inviolate forever," since such section of the Constitution also provides that "a jury trial may be waived by the parties in all civil cases in the manner prescribed by law," and the right of a trial by jury is preserved to all persons charged with incompetency under the Insanity Law by their complying with the requirements thereof. The proceedings under that law are "civil" within the meaning of the Constitution so that a trial by jury may be waived by the parties concerned, and the incompetent must be deemed to have waived her right thereto, where it does not appear that either she or her friends have demanded such a trial, and where it is conceded that she had notice of the proceedings. Moreover, the right to such a trial was personal to the incompetent and those mentioned in the statute, and if they have seen fit to waive a trial by jury, her debtors have no cause for complaint or power to raise the question of her sanity collaterally.

*Sporza* v. *German Savings Bank*, 119 App. Div. 172, affirmed.

(Argued December 17, 1907; decided April 7, 1908.)

Appeal from a judgment of the Appellate Division of the Supreme Court in the first judicial department, entered July 19, 1907, in favor of plaintiff upon the submission of a controversy under section 1279 of the Code of Civil Procedure.

The nature of the controversy and the facts, so far as material, are stated in the opinion.

*John E. Donnelly, William J. Amend* and *Alfred J. Amend* for appellant. Section 2323a of the Code of Civil Procedure, under which the plaintiff was appointed committee of the estate of the alleged incompetent, is unconstitutional and void, in that it violates section 2, article 1 of the Constitution of the state of New York, which provides that "the trial by jury in all cases in which it has been heretofore used shall remain inviolate forever." (*Wynehamer* v. *People*, 13 N. Y.

378; *Duffy* v. *People*, 6 Hill, 75; *Colon* v. *Lisk*, 153 N. Y. 188.) Section 2323a of the Code of Civil Procedure is unconstitutional and void, in that it violates section 1 of the 14th amendment to the Constitution of the United States, which provides that no state shall deprive any person of his life, liberty or property without due process of law. (*Colon* v. *Lisk*, 153 N. Y. 194; *Riglander* v. *Star Co.*, 98 App. Div. 101; 181 N. Y. 531; *Trust Co.* v. *S. D. Co.*, 109 App. Div. 665; *Matter of Walker*, 57 App. Div. 1; *Yick Wo* v. *Hopkins*, 118 U. S. 356; *People* v. *Rhinelander*, 3 N. Y. Cr. Rep. 341; Code Civ. Pro. § 208; *Grossman* v. *Caminez*, 79 App. Div. 15; *F. L. F. Co.* v. *Woods*, 187 N. Y. 90; *Schnaier* v. *N. H. & I. Co.*, 182 N. Y. 83; *People* v. *Marx*, 99 N. Y. 377.) Section 2323a of the Code of Civil Procedure is unconstitutional and void in that it violates section 1 of the 14th amendment of the Constitution of the United States, which provides that no state shall deny to any person within its jurisdiction the equal protection of the laws. (*Yick Wo* v. *Hopkins*, 118 U. S. 356; *F. L. F. Co.* v. *Woods*, 187 N. Y. 90; *Schnaier* v. *N. H. & I. Co.*, 182 N. Y. 83; *Colon* v. *Lisk*, 153 N. Y. 188; *Grossman* v. *Caminez*, 79 App. Div. 15; *People* v. *Havnor*, 149 N. Y. 195.) The designation of the defendant's depositor as "Ida Jetta" in the lunacy proceedings was a jurisdictional defect, which could not be cured by amendment. (*London* v. *Townshend*, 112 N. Y. 93; *Ferguson* v. *Crawford*, 70 N. Y. 253; *Farnham* v. *Hildreth*, 32 Barb. 277; *Schoellkopf* v. *Ohmeis*, 11 Misc. Rep. 253; *Matter of City of Buffalo*, 78 N. Y. 362; *Battell* v. *Torrey*, 65 N. Y. 294; *Matter of Valentine*, 72 N. Y. 184; *Horton* v. *McCoy*, 47 N. Y. 21; *Forman* v. *Marsh*, 11 N. Y. 544; *Stuyvesant* v. *Weil*, 167 N. Y. 421.)

*Joseph Weber* and *James E. Brande* for respondent. Section 2323a of the Code of Civil Procedure is constitutional. (*Matter of Walker*, 57 App. Div. 4; *Trust Co.* v. *S. D. Co.*, 109 App. Div. 665; *Matter of Lofthouse*, 3 App. Div. 142.)

Haight, J.  On the 22d day of November, 1897, one Ida Jetter opened an account with the defendant, The German Savings Bank in the City of New York, and at the date of the submission there was standing to her credit upon the books of the bank $1,309.72.    On the 20th of July, 1902, she was married to Frank Sporza, the plaintiff, and subsequently was duly committed to the Manhattan State Hospital at Ward's Island, under the name of Ida Jetta, as an incompetent person, in the manner provided by the State Insanity Law, where she ever since has been maintained and supported by the people of the state as a public charge.    On the 23d of May, 1906, upon the petition of the superintendent of the hospital, upon notice duly served upon the alleged incompetent and upon her husband and upon a hearing had, an order was entered in the Supreme Court appointing the plaintiff a committee of her estate, who duly qualified by giving the bond required by the order.    Thereupon payment of the amount so remaining to her credit on deposit in defendant's bank was demanded by him and refused upon the ground that her name was improperly spelled; and further that section 2323a of the Code of Civil Procedure, under which the plaintiff was appointed a committee, was in violation of the provisions of the Constitutions of this state and of the United States.    Upon application to the court, an order was entered correcting the spelling of the name by stating the various names under which she had been known.    This we think the court had power to do, and that no reason exists for the further withholding by the bank, of the funds belonging to her, by reason of any variance in the name or names under which she was known.

The question raised, however, with reference to the constitutionality of section 2323a of the Code of Civil Procedure, requires careful consideration and is one of much public importance, in view of the fact that it has been in force since 1895, and that several hundred appointments of committees have been made annually under it, through which not only personal estate but the title to real property has passed.    The provision is as follows: "Where an incompetent person has

been committed to a state institution in any manner provided by law, and is an inmate thereof, the petition may be presented on behalf of the state by a state officer having special jurisdiction over the institution where the incompetent person is confined, or the superintendent or acting superintendent of said institution; the petition must be in writing and verified by the affidavit of the petitioner or his attorney, to the effect that the matters therein stated are true to the best of his information or belief; it must show that the person for whose person or property, or both, a committee is asked has been legally committed to a state institution over which the petitioner has special jurisdiction, or of which he is superintendent or acting superintendent, and is at the time an inmate thereof; it must also state the institution in which he is an inmate, the date of his admission, his last known place of residence, the name and residence of the husband or wife, if any, of such person, and if there be none, the name and residence of the next of kin of such person living in this state so far as known to the petitioner; the nature, extent and income of his property, so far as the same is known to the petitioner, or can with reasonable diligence be ascertained by him. The petition may be presented to the supreme court at any special term thereof, held either in the judicial district in which such incompetent person last resided, or in the district in which the state institution in which he is committed is situated, or to a justice of the supreme court at chambers within such judicial district, or to the county court of the county in which the incompetent person resided at the time of such commitment, or of the county in which said institution is situated. Notice of the presentation of such petition shall be personally given to such person, and also to the husband or wife, if any, or if none to the next of kin named in the petition, and to the officer in charge of the institution in which such person is an inmate. Upon the presentation of such petition, and proof of the service of such notice, the court or justice may, if satisfied of the truth of the facts required to be stated in such petition, immediately appoint a committee of the person or

property, or both, of such incompetent person or may require any further proof which it or he may deem necessary before making such appointment." One of the purposes for which this provision was enacted was to secure reimbursement in whole or in part for maintenance and support in a state institution. (Code of Civil Procedure, § 2336a.)

It is contended that the provision of the Code alluded to is violative of the provisions of the State Constitution (Article 1, section 2) which provide that the trial by a jury in all cases in which it has heretofore been used shall remain inviolate forever, and that it is also violative of the provisions of the Constitution of the United States (§ 1, 14th amendment) which provide that no state shall deprive any person of his life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws.

Jurisdiction is inherent in the state over unfortunate persons within its limits who are idiots or have been deprived of the use of their mental faculties. It is its duty to protect the community from the acts of those persons who are not under the guidance of reason, and also to protect them, their persons and property from their own disordered and insane acts. In England, whence our law respecting idiots and lunatics is derived, the custody and care of such persons and their property are part of the prerogative of the sovereign. By the ancient common law they were intrusted to curators, who, being either the feudal lord or the next of kin, in case of an idiot whose disability was permanent, took his land and profits as the next in succession, subject to the obligation of supporting him during his life; but in the case of a lunatic who might recover his reason the curator was simply given the custody of the estate under the obligation of applying the profits to the support of the incompetent, retaining the excess to be returned with the estate in case of such recovery. Later on the duties of the curator were transferred to the king, whose duty was discharged by committing the custody of the person and of his estate to proper committees. This duty

was afterwards transferred to the lord chancellor, not as a part of his equitable jurisdiction, but as the king's delegate to exercise his special jurisdiction. (Fleta, 6; Reeves' History of English Law, by Finlason, vol. 2, ch. 12, p. 193, and note "a;" 1 Bl. Com. 303; 3 id. 427.) On our separation from Great Britain at the time of the Revolution, so much of the law, as formed a part of the king's prerogative which was applicable under our form of government, was vested in the people of the state and by legislative enactments was transferred to the chancellor, who should have the care of and provide for the safe keeping of all idiots and lunatics, and of their real and personal estates. (Act concerning lunatics, passed March 20, 1801; Revised Laws of 1813, ch. 30, vol. 1, p. 141.) And upon the organization of the Supreme Court this jurisdiction was transferred to it.

The statutory provision for the care of the insane during the early history of our state is somewhat meager; and the practice with reference to the detention and confinement of an insane person and the appointment of a committee was somewhat uncertain and had to be sought for in the adjudicated cases and books upon practice. It was common practice for the relatives and next of kin of persons who had become insane, if violent, to restrain them and place them in some retreat or institution for their care and medical treatment. The writ of habeas corpus was always available to inquire into the cause of such detention and to release such persons in case they were found sane; but if insane, their detention was sanctioned under the police power of the state on account of the necessity of protecting them and the public from their disordered minds and insane acts. The usual practice, however, was to procure a writ *de lunatico inquirendo*, under which an inquisition was held before a jury, and the question of the mental disorder of a person determined by a verdict. The contention is made that the verdict of the jury was not a matter of right, but that it was resorted to by the chancellor for the purpose of informing the conscience of the court. In *Matter of Wendell, a Lunatic* (1 John. Ch. 600) Chancellor KENT,

after reviewing the statute in England of 2 and 3 Edward
VI, says, "we need not stop to discuss the construction of the
statute," for the reason that it had not been re-enacted or
adopted in this state, and then says: "The care and custody
of idiots and lunatics, being confided to this court, the whole
control of the inquisition, and the manner in which that con-
trol shall be exercised, would seem to depend entirely on the
discretion of the court. The lunatic may be brought into
court and inquiry made, by inspection, after the inquisition
is returned, as was declared in *Heli's Case* (3 Atk. 634); and in
the case of returning sanity this is frequently the course,
aided, also, by affidavits and the certificates of physicians.
So, on the execution of the commission, the commissioners
and the jury have the right to inspect and examine the
lunatic. (*Ex parte Southcote,* Amb. 109.) An issue may
also be awarded to ascertain, by a verdict at law, the existence
or continuance of the lunacy, as was done in the case *ex parte
Holyland* (11 Ves. 10). If a traverse be tendered and allowed
and the attorney-general has filed a replication and taken
issue upon it, the course, in England, is, undoubtedly, to trans-
mit the record to the K. B., to have the question tried at law.
*But as the whole jurisdiction of the subject is in this court,
the object, in either mode, must be merely ad informandam
conscientiam, and to arrive at a safe conclusion as to the
existence of the fact.*"

In *Matter of Tracy* (1 Paige, 580) Chancellor WALWORTH
says: "In this state the care and custody of the estates of
lunatics, idiots and habitual drunkards is confided to this
court, without any restriction or limitation. The manner in
which the control is to be exercised must, therefore, depend
upon the sound discretion of the chancellor. He may direct
an issue to inform his conscience, whenever he deems it neces-
sary, as in other cases. The practice here has been to award
an issue in all cases where a jury trial was proper, instead of
permitting a formal traverse. (*Wendell's Case,* 1 John. Ch.
600; *Folger's Case,* 4 John. Ch. 169.) It is certainly proper
in cases of doubt to permit a party to have a trial by jury

before he is deprived of his property or his liberty, either by
his misfortune or his fault."

In *Matter of Mason* (1 Barb. 436) HARRIS, J., says:
"By the statute of this state, the care and custody of the per-
sons and estates of lunatics, idiots, persons of unsound mind,
and habitual drunkards is confided to the court of chancery,
without any restriction or limitation. The manner in which
the control thus given is to be exercised is entirely a matter
of discretion. The form of the return of the inquisition is
only important so far as it is necessary to satisfy the conscience
of the court. If, upon the coming in of the inquisition,
enough appears to enable the court to adjudge the party to be
within some one of the classes of persons over whom the statute
has given it jurisdiction, it is sufficient. A discreet exercise
of the power vested in the court undoubtedly requires that
before a citizen shall be deprived of his liberty, and the con-
trol of his own property, evidence of the most conclusive
character should be produced, showing him to be a person for
whose benefit the law has benignly provided this delicate and
important trust. But I am not prepared to say that a case
might not be presented to the court in which the evidence
would be so clear and satisfactory as to justify the exercise of
its summary power for the protection of a party without the
intervention of a jury. Whether this be so or not, I cannot
doubt that under the law of this state it is enough to vest the
court with jurisdiction of the case when, as in the case under
consideration, the jury find that the party is mentally incapable
of governing himself or managing his affairs."

It is thus apparent that at the time the provision to the
effect that a trial by jury in all cases in which it has heretofore
been used shall remain inviolate forever was first incorporated
into our Constitution, the custom prevailed, on the part of the
chancellor, in order to inform his conscience, to require a trial
by jury of the question of the insanity of a person, in all
cases of doubt, in proceedings taken with reference to his
commitment and to the disposal of his property.

In 1842, by chapter 135, the legislature passed an act to organize a state lunatic asylum, and to provide for the care, maintenance and medical treatment of the insane therein. Among other things it was provided that no person should be admitted to the asylum except upon an order of a court, based upon a certificate under oath by two physicians ; that if such person was dissatisfied with the decision of the court he might within three days after such order appeal to one of the judges of the county, who was required forthwith to call a jury to decide upon .the fact of his lunacy. By chapter 446 of the Laws of 1874 the Insanity Law was revised. A provision was made for the commitment of persons to public and private asylums upon the certificate of two physicians, approved by a judge of a court, the principal features of which have now been incorporated into our Insanity Law, being chapter 545 of the Laws of 1896, under which it is provided that, in the proceedings to commit a person to an asylum, a notice to the alleged insane person must be given, unless it is made to appear to the judge that the giving of such notice might be injurious or dangerous to the person, in which case he may make an order dispensing with the giving of such notice, specifying the reasons in the order. The judge is required to examine the certificate of the medical examiners, and such other facts as shall be produced before him, and upon the demand of relatives or next friends to adjourn the hearing until they have an opportunity to present evidence, and then to make a determination in writing as to the sanity or insanity of the person ; and if he be found insane, to.make a commitment to the hospital. This order is called a final order, and the statutes further provide that in case the alleged incompetent, or any friend in his behalf, is dissatisfied with the determination made, he may appeal to a justice of the Supreme Court, other than the one making the order, who shall cause a jury to be summoned to try the question of such insanity in the same manner as in the proceedings for the appointment of a committee. We thus have the right of a trial by jury preserved to every individual com-

mitted to a state hospital upon his demand or that of any friend in his behalf, by the express provisions of the statute.

The record in this case fails to disclose the proceedings had upon the commitment of the incompetent to the state hospital. All we have is an allegation that the commitment was lawfully made in the manner provided by the Insanity Law. We must assume that all the steps required by that statute were regularly taken and that she was an inmate of the Manhattan State Hospital, duly committed according to law. By such commitment she became a ward of the state. The state, through its officers, had undertaken her care, maintenance and medical treatment. Although a ward of the state she also became a ward of the court, which still had the power from time to time to inquire as to the continuance of her insanity, and also to take in charge the care and preservation of her property. She being in the custody of the state, receiving care, maintenance and support, the state through its superintendent petitioned the court for the appointment of a committee, to the end that it might be reimbursed out of her property for the expenses it had incurred for her care and treatment. This was authorized by the provisions of the Code alluded to, which here are claimed to be violative of the provisions of the Constitutions, both State and Federal. If she had been adjudged to be insane, then she has been deprived of no constitutional right; for, being an insane person, she had become a ward of the Supreme Court, which has succeeded to the powers of the chancellor, and the custody of her person and property became subject to the control and management of the court through its specified agents appointed for that purpose. She is not deprived of her liberty or property without due process of law, for, as we have seen, she has been duly committed in accordance with the provisions of the statute upon an order of the court. She is not deprived of her property, for the court undertakes its care and management in her behalf and for her benefit.

We are thus again brought to the consideration of the commitment, for if it is an adjudication by the court, then, as

we have seen, it is a compliance with the provisions of the Constitution. The statute and the facts we have already called attention to. Whether the incompetent in this case actually had a trial by jury and her insanity established by a verdict, we are not advised by the record, for we have only the admission that she was committed lawfully in accordance with the provisions of the Insanity Law. This law, as we have seen, provides for a hearing upon notice, unless, for reasons stated, the notice is dispensed with. The judge is required to examine the testimony of the physicians and such other witnesses as are produced before him. He then is required to make a determination, in writing, and the same is to be filed in the manner and at the place specified by the statute. If the incompetent, or any of her friends, is dissatisfied, she or they may demand a jury trial and the question of her sanity be determined by a jury. It appears to us that this is a judicial determination. This, in effect, was held in the case of *Trust Co. of America* v. *State Safe Deposit Co.* (187 N. Y. 178), in which Willard Bartlett, J., in delivering the opinion of the court, says: " Section 2323a of the Code was added to title VI in 1895, together with another new section (2336a), to establish a scheme whereby steps might be taken at the instance of the officers having charge of the various state hospitals for the insane to reimburse such institutions for their expenditures for the support of insane patients who had no relatives or friends liable or willing to contribute to their support, but where the patient was the owner of property which ought to be used to defray such expenditures. In most of the cases contemplated by these sections there would be an express adjudication of mental incompetency before the patient was committed to the institution, and, therefore, the section omits any provision for such adjudication and empowers the court to appoint a committee, if satisfied with the truth of the facts required to be stated in the petition immediately and without taking any further proof." Again, in the recent case of *People ex rel. Morrell* v. *Dold* (189 N. Y. 546) the relator

obtained a writ of habeas corpus to procure his release from River Crest Sanitarium, in which he was confined as an insane person, upon the ground that he was committed to the sanitarium without notice. The defendant made return thereto to the effect that the relator was insane at the time he was committed to the sanitarium and that he was still insane. A traverse was interposed to this return and thereupon the defendant asked that a jury be impaneled to try the question of the relator's present insanity. This the relator opposed and declined to submit to a trial by jury, and thereupon the Special Term overruled the traverse and dismissed the writ and remanded the relator to the custody of the sanitarium. This order was affirmed in the Appellate Division and in this court; in effect holding that the original commitment was a valid adjudication of his insanity.

As we have seen, this case is not one where the alleged incompetent has been confined by relatives in a private institution; but she has become a ward of the state and is confined in a state hospital presided over by expert physicians who can have no motive for her detention other than that which is necessary for her benefit. She is in the custody of the state itself, whose policy is to care for and protect her and if possible to cure her of her disease. The state stands in the place of the king. Its power is supreme. True, it acts through officers of the state duly appointed and these officers may transcend their powers and duties. But if they do, the courts, which the state has created, are always open to restrain the unauthorized acts of such officers and preserve her constitutional rights. A person afflicted with a disordered mind is not a criminal, nor are proceedings instituted to commit such person to an asylum criminal proceedings. Under the provisions of the Constitution "the trial by jury in all cases in which it has been heretofore used shall remain inviolate forever; but a jury trial may be waived by the parties in all civil cases in the manner prescribed by law." As we have seen, the right of a trial by jury is preserved to every person charged with incompetency under the Insanity Law, by his complying

with the requirements of that statute. The proceedings, how-
ever, being civil, such a trial may be waived by the parties
concerned, under the express provision of the Constitution to
which we have referred. In this case Mrs. Sporza had the
right to such a trial by jury if she or her friends so demanded.
Neither she nor her friends appear, by the record, to have
demanded such a trial, although it is conceded that she had
notice of the proceedings to appoint a committee of her per-
son and estate. She must, therefore, be deemed to have waived
such a trial. The right to such a trial was personal to her
and those mentioned in the statute. Debtors are not such
persons. If, therefore, she or her friends acting for her saw
fit to waive a trial by jury and accept the determination of
the court made as to her insanity, then the defendant had no
cause for complaint or power to raise the question of her
sanity collaterally in this case.

No question has been raised with reference to any irregu-
larity in the proceedings under the Code. Our conclusion is
in accord with that reached in *Matter of Walker* (57 App.
Div. 1), to the effect that the provision of the Code alluded
to is not violative of any of the provisions of the Constitution
to which attention has been called.

The judgment should be affirmed, with costs.

WILLARD BARTLETT, J. The plaintiff seeks to recover a sum
of money deposited with the defendant savings bank in the
name and on account of Ida Jetter, who subsequent to the
opening of the account married Frank Sporza, the plaintiff, and
became known as Ida Sporza. In May, 1906, Dr. William
Mabon, the superintendent of the Manhattan State Hospital at
Ward's Island, New York, presented a petition to the Supreme
Court in the first judicial district, applying for the appointment
of a committee of the estate of Ida Jetta under the provisions
of section 2323 and section 2323a of the Code of Civil Proced-
ure. The petition alleged " that the above named Ida Jetta
is an incompetent person and has been lawfully committed to
the Manhattan State Hospital at Ward's Island, New York, in

the manner provided by the State Insanity Law,  * * * that said Ida Jetta is now an inmate thereof * * * that the patient has $1,263.36 in the German Savings Bank as evidenced by bank book No. 369,363, and that said Ida Jetta has no other property, real or personal,  * * * and that said Ida Jetta is now maintained and supported by the people of the state of New York in said hospital as a public charge." Copies of the petition and a notice of the motion to be based thereon for the appointment of a committee were served personally upon Ida Jetter, otherwise known as Ida Sporza, at the Manhattan State Hospital, and upon the officer in charge thereof and upon Frank Sporza, the husband; and upon the return day an order was made and entered appointing Frank Sporza committee of the estate of the incompetent person upon giving the security required by law. In this order the name of the incompetent person was erroneously given as Ida Jetta instead of Ida Jetter, but this error was corrected by a subsequent order which the court undoubtedly had power to make.

The German Savings Bank resists the claim which the committee thus appointed now makes to the money deposited with it on account of Ida Jetter, upon the ground that section 2323a of the Code of Civil Procedure is unconstitutional because it assumes to empower the Supreme Court to appoint a committee of the person or property of an incompetent person or of both without the intervention of a jury.

The Constitution of New York adopted in 1777 contained the following provision preserving the right of trial by jury : "Trial by jury in all cases in which it hath heretofore been used in the colony of New York shall be established and remain inviolate forever." By the Constitution of 1821 the form of this provision was changed so as to read as follows : " The trial by jury in all cases in which it has been heretofore used shall remain inviolate forever." This provision is the same as that contained in the present Constitution having been retained by the constitutional conventions of 1846 and 1894. (Const. of 1894, art. 1, § 2.) In *Wynehamer* v. *People* (13 N. Y. 378, 427),

a case which arose while the Constitution of 1846 was in force, it was said that the word " heretofore " in the constitutional provision relating to trial by jury meant before 1846 and could not in order to limit its meaning be carried back to 1777 and confined to the cases which at that earlier period were triable by jury. Applying this rule of construction it would be sufficient to inquire in the present case only whether the trial by jury as a prerequisite to the appointment of a committee of a lunatic was in use prior to 1894, but if we find that such a trial was invariably required in the colony of New York and in England before the Constitution of 1777 was adopted it would necessarily follow that section 2323a of the Code of Civil Procedure is unconstitutional if that section must be construed as authorizing the appointment of a committee in the absence of a prior finding by a jury that the party whose person or property is to be affected is incompetent.

In England there has been considerable discussion as to what is the true origin of the authority of the Crown in respect to idiots and lunatics. Story, writing in 1835, said that the jurisdiction was usually treated as a special jurisdiction for many purposes derived from the special authority of the Crown in its sign manual to the chancellor personally and not as belonging to him as chancellor or as sitting in the Court of Chancery. But he concludes that " the Court of Chancery may be properly deemed to have had originally, as the general delegate of the authority of the Crown as *parens patriæ*, the right not only to have the custody and protection of infants, but also of idiots and lunatics, when they have no other guardians." (2 Story's Equity Jurisprudence [13th ed.], § 1362.) The legislature in this country has succeeded to the king as *parens patriæ* in reference to idiots and lunatics. (*Mormon Church* v. *United States*, 136 U. S. 1.) Blackstone discussed the custody of incompetent persons in a chapter entitled the King's Revenue, and also under the title " Suits by the Crown." He says that the last branch of the king's ordinary revenue " consists in the custody of idiots, from whence we shall be naturally led to

consider also the custody of lunatics;" and in reference to
the procedure in such cases he adds: "By the old common
law there is a writ *de idiota inquirendo* (of inquiring concern-
ing an idiot), to inquire whether a man be an idiot or not;
which must be tried by a jury of twelve men; and, if they
find him *purus idiota* (an absolute idiot), the profits of his
lands, and the custody of his person may be granted by the
king to some subject, who has interest enough to obtain
them." In reference to lunatics as distinguished from idiots
he states the practice as follows: "The method of proving a
person *non compos* is very similar to that of proving him an
idiot. The lord chancellor, to whom, by special authority
from the king, the custody of idiots and lunatics is intrusted,
upon petition or information, grants a commission in nature
of the writ *de idiota inquirendo*, to inquire into the party's
state of mind; and if he be found *non compos*, he usually
commits the care of his person, with a suitable allowance for
his maintenance, to some friend, who is then called his com-
mittee." (1 Blackstone's Com. 303, 304, 305.) It will
be noticed that in reference to the writ *de idiota inquirendo*,
Blackstone states that it must be tried by a jury of twelve
men. In another place, however, where he is discussing
inquisitions of office as one of the common forms of suits by
the Crown, he says that such inquiries concerning any matter
that entitled the king to the possession of lands or tenements,
goods or chattels, "is done by a jury of no determinate num-
ber; being either twelve, or less, or more." (3 Blackstone's
Com. 258.)

Professor Pomeroy states the mode of exercising jurisdic-
tion over persons of unsound mind in England as follows:
"Some friend of the alleged lunatic addresses a petition to
the chancellor personally, or other judge in lunacy; a special
commission is thereupon issued, directing a judicial inquisition
of the alleged lunacy, which inquisition is made by means of
a jury, — a regular trial of the issues before a jury; their find-
ing or verdict, so long as it stands unimpeached, and the
inquisition is not superseded, is conclusive as to the status of

the party. Upon the return of the commission and inquisition, if the party is found to be a lunatic, the chancellor or judge in lunacy appoints a committee in the nature of a guardian over the person and property of the lunatic. This committee, in his character as trustee, is, of course, under the supervision and control of the court of chancery." (3 Pomeroy's Equity Jurisprudence, § 1312.) It is true he supplements this description of the procedure by a statement that this special jurisdiction over the persons and property of lunatics is not generally possessed by the courts of equity in the United States as a part of the original inherent equitable jurisdiction; but that is not a question material to be considered here, inasmuch as the purpose of our inquiry is to ascertain the usage prevailing in this state at the time of the adoption of the several Constitutions guaranteeing the right of trial by jury in all cases in which it has heretofore been used; and it appears, so far as I have been able to discover, that the usage of our courts in the exercise of their statutory equitable jurisdiction over idiots and lunatics has always heretofore been in accordance with the former English practice as laid down in the authorities cited.

Further light on the English method of procedure may be found in Shelford on Lunacy, where it is said that when the king was informed that a person who had lands was an idiot or lunatic, the ancient mode of proceeding in order to ascertain the existence of the fact of idiocy or lunacy was to petition the lord chancellor suggesting idiocy or lunacy in a particular person, and thereupon to issue a writ to the sheriff or escheator of the county to try by a jury and personal examination of the party whether the suggestion was true or not. (Shelford on Lunacy, 79.) The inquisition was required to be under the seals of twelve jurymen, otherwise the officer by whom it was taken was liable under the statute (1 Henry VIII, c. 8) to a penalty of one hundred pounds. (Ib. 106.)

It is manifest that in England, up to a period long subsequent to the adoption of the New York Constitution of 1777, the verdict of a jury was essential to establish the status of a

person alleged to be incompetent either as an idiot or a lunatic. Thus, in 1826, in a case in the House of Lords, Lord Chancellor ELDON declared it to be unquestionable that the Crown in England did not possess the power, except for temporary purposes, of taking upon itself the care of any individuals, either as to their persons or their property, on the ground that they were of unsound mind, without the verdict of a jury. (*Bryce* v. *Graham*, 2 Wilson & Shaw, 481, 517.) It is true that a change has since been effected in England by statute, and that under the Lunacy Act of 1890 an inquest may be held before a judge in lunacy without a jury where the alleged lunatic does not demand one, or the judge is satisfied by a personal examination that he is not mentally competent to form and express a wish in that behalf and it appears unnecessary or inexpedient that the inquest should be before a jury. (53 Vict. chap. 5, §§ 91, 92.) This alteration in the English practice cannot affect the question under consideration here, where our Constitution requires a trial by jury in all cases in which it has heretofore been used, the answer to that question depending, of course, upon the condition of the law in this state or colony before the adoption of the Constitution.

In those states in which it has been held that the constitutional right of a trial by jury does not apply to cases of lunacy the language of the Constitution differs from that used in the Constitution of this state. Thus, in Wisconsin, where the Constitution provided that the right of trial by jury " shall remain inviolate and shall extend to all cases at law without regard to the amount in controversy," it was held that a proceeding for the appointment of a guardian for an insane person was not a case at law, and that at the time when the Constitution was adopted the power to appoint guardians for insane persons was vested in the judges of probate who might act without calling in a jury to determine the question of insanity. (*Gaston* v. *Babcock*, 6 Wis. 503.) So in Iowa it has been held that the constitutional right of trial by jury applies only to criminal prosecutions or accusations for

offenses against the criminal law and that an inquest of lunacy was not a criminal proceeding. (*In re Bresee*, 82 Ia. 573.) And in Mississippi an inquisition of lunacy before a jury of six men was held to be constitutional because an inquest before a jury of that number was authorized by statute at the time when the Constitution was adopted. (*Fant* v. *Buchanan*, 17 So. Rep. 371.) I cannot see how any of these decisions or others of like purport affect the construction to be given to our own Constitution. That the guaranty of the right of trial by jury in the Constitution of this state does not apply merely to criminal cases but embraces other proceedings was expressly determined by this court in *Colon* v. *Lisk* (153 N. Y. 188) and is assumed by the discussion in the case of *Malone* v. *Sts. Peter and Paul's Church* (172 N. Y. 269).

The Constitution of New Jersey provides that the right of trial by jury shall remain inviolate. In that state prior to 1887 the number of jurors who sat upon the trial of the issue of incompetency in the case of an alleged lunatic, varied from twelve to twenty-three. Thus, in *Matter of Runey Dey* (9 N. J. Eq. 181) twenty-three jurors concurred in the finding of lunacy and in *Matter of Vanauken* (10 N. J. Eq. 186) twenty-one jurors were sworn and twenty signed the return. In 1887, however, the legislature passed an act directing the sheriff to summon only twelve jurors instead of twenty-four to inquire into and find the truth of the matters involved in a commission relating to the competence of alleged idiots and lunatics. It was contended in the case of *De Hart* v. *Condit* (51 N. J. Eq. 611) that the act violated the right of trial by jury as guaranteed by the New Jersey Constitution. In that case the jury consisted of only twelve men all of whom concurred in the finding. The Court of Errors and Appeals refused to disturb the inquisition. "If we assume," said DIXON, J., "that the constitutional provision applies to proceedings of this nature, still this statute does not infringe upon it for the reason that prior to the adoption of the constitution the party had no right to trial by more than twelve jurors." He cites the statements of Blackstone, to which I

have referred, and declares that in practice any number of jurors not less than twelve nor over twenty-three has been considered adequate.

A careful examination of the New York statutes and decisions bearing upon the subject leaves no doubt in my mind that prior to the Constitution of 1846, and since then until the enactment of section 2323a of the Code of Civil Procedure, the courts in this state have not assumed jurisdiction to appoint a committee of the person or estate of an incompetent person, in the absence of a finding by a jury in a proceeding in the nature of a writ *de lunatico inquirendo*.

By chapter 30 of the Laws of 1801 it was provided " that the chancellor shall have the care and provide for the safe keeping of all idiots and lunatics and of their real and personal estates and for their maintenance, and also for the maintenance of the families of such lunatics and the education of their children out of the personal estate of such idiots and lunatics and the rents and profits of their real estates respectively, having regard to the amount and value of the same and shall take care that the same shall not be wasted or destroyed." By the Revised Statutes which took effect on January 1, 1830, the same provision was substantially re-enacted; but extended so as to embrace not only idiots and lunatics, but " persons of unsound mind and persons who shall be incapable of conducting their own affairs in consequence of habitual drunkenness." (2 R. S. 52.) After the adoption of the Constitution of 1846 the judiciary act of 1847 transferred to the new Supreme Court the jurisdiction then possessed and exercised by the old Supreme Court and the Court of Chancery, including that of the chancellor and vice-chancellors. (Laws of 1847, chap. 280.) The act to revise and consolidate the statutes of the state relating to the care and custody of the insane passed in 1874 conferred in express terms upon the Supreme Court jurisdiction over the care and custody of all idiots, lunatics, persons who shall be incapable of conducting their own affairs in consequence of habitual drunkenness and of their real and personal estates. (Laws

of 1874, chap. 446.)   This provision was re-enacted in section
2320 of our present Code of Civil Procedure which, however,
extended the jurisdiction still further to cases of " imbecility
arising from old age or loss of memory or understanding or
other cause."   The New York procedure in this class of cases
is clearly stated in Barbour's Chancery Practice (2d revised
edition, vol. 2, p. 228), and also by Judge WILLARD in his
treatise on Equity Jurisprudence which has special reference
to the law of New York.   (Willard's Equity Jurisprudence
[Potter's edition], pp. 681, etc.)   The first step was to apply
for a commission in the nature of a writ *de lunatico inqui-
rendo*.   The petition was *ex parte* but it had to be presented
to the court on a regular motion day.   The commission issued
thereupon was substantially in the same form as that prescribed
by the chancellor in respect to habitual drunkards in the
appendix to the rules of the Court of Chancery.   After a cer-
tified copy of the commission had been served upon the com-
missioners they were required to issue a precept to the sheriff
of the county where the commission was to be executed
requiring him to cause a jury of good and lawful men of the
county to appear before them to inquire into the matters and
things which should be given them in charge by virtue of
the commission.   Under this precept the sheriff summoned
not less than twelve nor more than twenty-four jurors ;
and Barbour states that no inquest could be taken upon the
oaths of less than twelve jurors.   The testimony was then
taken as upon a trial at law, and Judge WILLARD says the
commissioner should thereafter submit the matter to the
jury in the form of a charge, stating the law applicable
to the case and recapitulating the facts if necessary but
without arguments on either side.   " Twelve of the jury must
agree one way or the other, and if twelve cannot agree the
jury must so report to the commissioners that their return
may be made accordingly."   If the inquisition found the
alleged lunatic to be incompetent to manage himself or his
affairs, it was still within the discretion of the court to set it
aside and refuse to appoint a committee.

The statutes to which I have referred and many of the decisions involving the jurisdiction of the Supreme Court as the successor of the Court of Chancery over the persons and estates of lunatics were reviewed and discussed with learning and ability by Mr. Justice Cornelius L. Allen in *Matter of Hugh Payn,* an alleged lunatic (8 Howard's Prac. Reports, 220). It is true that this is only a Special Term decision, but it is to be remembered that the judge who rendered it was subsequently a member of this court. After a careful consideration of the whole question he reached the conclusion that the Supreme Court had no jurisdiction to appoint a committee of a lunatic before a commission had been issued and an inquisition returned with a finding of lunacy by a jury. This decision was rendered in 1852. It clearly shows what the practice had been up to a period subsequent to the adoption of the Constitution of 1846. I cannot find that there has been any change in the practice since, except that the court is permitted, under section 2327 of the Code of Civil Procedure, instead of ordering that a commission issue, to direct that the question of fact arising upon the competency of the alleged lunatic may be tried before a jury at a Trial Term. The unvarying practice seems to have been to require a jury trial as a condition precedent to the appointment of a committee for the person or estate of a lunatic.

Reference is made to *Matter of Wendell* (1 Johnson's Chancery, 600) and *Matter of Tracy* (1 Paige, 580) as authorities for the proposition that the verdict of the jury in cases of this character is taken merely to inform the conscience of the court and not in recognition of an absolute right on the part of a person whose competency is assailed; but this view arises, I think, from a misapprehension of the question under discussion in those cases. In both of them an inquisition had already been had upon which a jury had found the party to be incompetent and the question under consideration was whether he should subsequently be allowed to *traverse* the inquisition and have the issue of lunacy again sent to a jury for trial. The observations of the court in

these and similar cases, therefore, can have no application to the question presented here. The same is true in regard to *Matter of Mason* (1 Barb. 436), heard before Judge Harris at Special Term in 1847, although I cannot concur with the suggestion, which had no relevancy to the motion before him, that a case might be presented in which the evidence would be so clear and satisfactory as to justify the exercise of the summary power of the court to deprive a citizen of his liberty without the intervention of a jury.

In considering the question whether a finding of incompetency by a jury is a condition precedent to the appointment of a committee it is important to distinguish between proceedings having this end in view and proceedings instituted in the exercise of the police power for the temporary restraint of an insane person prior to the appointment of any committee. It is essential, of course, not only for the welfare of incompetent persons themselves but for the protection of their relatives and the community at large that authority should exist somewhere to restrain those manifesting evidence of insanity, to the end that they may be properly treated for the purpose of effecting a cure and to protect those who may be endangered by violence at their hands.

At common law any one, even though not a relative, might interfere to restrain an insane person who was dangerous to himself or others. (*Brookshaw* v. *Hopkins*, Lofft, 243.) A dangerous maniac might always be restrained temporarily until he could be safely released or arrested by judicial warrant or committed to an asylum under legal authority (*Keleher* v. *Putnam*, 60 N. H. 30), but when the immediate safety of the lunatic himself and others had been provided for the right of interference ended. (*Colby* v. *Jackson*, 12 N. H. 526.) The provisions of our Insanity Law (Laws of 1896, chap. 545, art. III) relating to the commitment of alleged incompetent persons upon medical certificates and similar statutory provisions generally are designed to effect the same object under legal sanction as was accomplished at common law by the interference of private persons to restrain a lunatic

in order to prevent him from doing harm to himself or others. To this end persons alleged to be insane may be committed to institutions for the custody and treatment of such patients upon an order made by a justice of the Supreme Court or other judge of a court of record. Such commitment is based upon an order " adjudging such person to be insane upon a certificate of lunacy made by two qualified medical examiners in lunacy." (Laws of 1896, chap. 545, § 60.) The Insanity Law further provides (ib. 63) for an appeal from such order of commitment to a justice of the Supreme Court other than the justice making the order, who thereupon " shall cause a jury to be summoned as in case of proceedings for the appointment of a committee for an insane person, and shall try the question of such insanity in the same manner as in proceedings for the appointment of a committee."

The proceedings thus provided for by the Insanity Law are in no wise designed as a substitute for those upon an inquisition *de lunatico inquirendo.* The purposes of the Insanity Law are protective merely, although an order for a commitment thereunder is described as " adjudging such person to be insane." The order is not strictly speaking a judgment at all, for it does not affect the status of the person alleged to be insane. This has been held in regard to a similar statute in Massachusetts, where it was said : " The order of commitment settles nothing finally or conclusively against the person committed. It does not take from him the care or control of his property. It is not equivalent to the appointment of a guardian over him. He is entitled as a matter of right to institute judicial proceedings under the statutes, to determine the necessity and propriety of his confinement " (*Matter of Dowdell,* 169 Mass. 387.) Notwithstanding a commitment under the Insanity Law, a person thus committed remains liable to service of civil process (Code Civ. Pro. § 427), and until a committee has lawfully been appointed for him his legal right to control his property remains unaffected. The so-called adjudication made upon the certificate of the medical examiners in lunacy merely affords judicial warrant

for the detention and treatment of the alleged incompetent in a state hospital or other institution licensed by the state for the care and treatment of the insane. The proceeding has no reference to the appointment of a committee. If a committee is sought to be appointed that object must be attained under the provisions of the Code of Civil Procedure, which, as we have seen, are derived from the practice existing in this state from the earliest times and which require a finding of incompetency by a jury either upon an inquisition or at a Trial Term of the Supreme Court. From no point of view can the privilege of a jury trial upon an appeal from an order of commitment under the Insanity Law be regarded as the equivalent of the right of trial by jury guaranteed by the Constitution. (*People ex rel. Eckerson* v. *Trustees Vil. of Haverstraw*, 151 N. Y. 75.) It is to be noted that the Insanity Law does not allow the alleged incompetent person to demand a jury trial upon appeal as a matter of right. Before the appeal can be heard at all the appellant must make a deposit or give a bond for the payment of the costs of the appeal if the order of commitment is sustained. (§ 63.)

Another point on this branch of the case requires to be noticed. It is suggested that this court has more than once said that our constitutional provision relative to trial by jury referred to a common-law jury of twelve men. (*People ex rel. Murray* v. *Justices, etc.*, 74 N. Y. 406; *People* v. *Dunn*, 157 N. Y. 528.) That statement was perfectly accurate in the criminal cases in which it was made, but I cannot find in it anything which amounts to a denial of the proposition that if the right to a trial by a jury such as was customarily summoned under a commission *de lunatico inquirendo* existed before the Constitution, it is not equally preserved by the fundamental law. It is further to be observed that in such a jury, even though twenty-three might be summoned, the concurrence of twelve was necessary in order to constitute a legal finding.

I do not think there is anything in the opinion of *Trust*

*Co. of America* v. *State Safe Deposit Co.* (187 N. Y. 178) which is necessarily in conflict with the views here expressed.

My conclusion is that if section 2323a of the Code of Civil Procedure is intended to apply to an incompetent person who has been committed to a state institution without an inquisition executed in the usual manner before a jury or without a jury trial of the issue of incompetency in court, then it is unconstitutional. If, however, it may be construed as applying only to persons who have thus been adjudicated incompetent by the finding of a jury but for whom no committee has as yet been appointed (by reason, for example, of no property being discoverable at the time of the inquisition), then it may be regarded as constitutional. I think it may be thus construed; and hence as it is not made to appear in the present case that the incompetency of Ida Sporza had not been ascertained and declared upon an inquisition by a jury or by a jury at Trial Term of the Supreme Court, it must be assumed that such was the fact. Upon this assumption the judgment below was right and must be affirmed.

GRAY, EDWARD T. BARTLETT, WERNER and HISCOCK, JJ., concur with HAIGHT, J.; WILLARD BARTLETT, J., concurs in result in opinion, with whom CULLEN, Ch. J., concurs.

Judgment affirmed.