JUNE M. McCANDLESS, an Incompetent, by GRACE I. McCANDLESS, Her Guardian ad Litem, Respondent, v. STATE OF NEW YORK, Appellant. (Claim No. 31833.)

Third Department, May 8, 1957.

*Louis J. Lefkowitz, Attorney-General (John R. Davison, James O. Moore, Jr.,* and *Peter E. Herzog* of counsel), for appellant.

*Isidore Neuwirth, Emil Katzka* and *Abraham Fleischmann* for respondent.

GIBSON, J. Claimant, while a mentally ill patient at Pilgrim State Hospital, became pregnant. Some months later an abortion was induced by operative procedure undertaken by members of the hospital staff. Proceeding from these basic facts, claimant alleges two causes of action against the State and has recovered on both. As to the first, the trial court found the State negligent in failing to furnish adequate supervision of its

patients and held such negligence to be the proximate cause of an assault upon claimant, the court thus denominating the act of intercourse whereby her pregnancy was caused. Under the second cause of action, the operation to terminate pregnancy was found to have been performed without legal justification and the State was held liable.

Claimant became 21 years of age on September 19, 1952. Her mental illness, diagnosed as dementia praecox of the hebephrenic type, had persisted for at last three and one-half years prior to that time. During this period her assaultive and suicidal tendencies were noted and when her condition did not improve after shock therapy treatments, a bilateral prefrontal lobotomy was performed on April 22, 1952. There was medical testimony that thereafter her condition had shown steady improvement until some time after her pregnancy occurred.

On January 7, 1953, claimant was found to be from four to five months pregnant, as the result, according to the findings of the court below, of an act of intercourse with a fellow patient which occurred in or near a hallway off an assembly hall where a dance was in progress. We do not pass upon the trial court's conclusion that the act constituted an assault by reason of claimant's mental illness nor do we evaluate the testimony, of doubtful competency, upon which the court determined the place of the occurrence and the identity of the person responsible for claimant's pregnancy, as we find, even if the correctness of those determinations be assumed, that proof of negligent and inadequate supervision is lacking.

Claimant's evidence with respect to supervision was necessarily adduced from hospital employees called by her. It was shown that dances were held regularly at the hospital, as at other State hospitals for the mentally ill, being deemed of therapeutic value in aiding the social adjustment of patients displaying improvement sufficient to offer hope of their later being sent home. No contention is raised as to the soundness of this theory or as to the propriety, from a medical standpoint, of the attendance at the dance of claimant and the male patient supposedly involved. After her pregnancy became known to the hospital, claimant is said to have mentioned some attentions paid her by the male patient in question but there is no clear indication as to when these occurred and none that any hospital employee knew or should have known of them.

The dances in question were conducted for two-hours periods, morning and afternoon. It does not appear how frequently those patients permitted to dance did attend. Normally, approximately 450 patients were sent to the morning dance period and

about 600 to that conducted in the afternoon. Customarily, about 40 patients were sent from the building where claimant was confined, accompanied by from 7 to 9 attendants who escorted the group to a particular section of the assembly hall and remained with that group, the members of which were required to return, between dances, to the section assigned them. The room was from 120 to 130 feet in length and some 60 feet wide. Supervisors and attendants, additional to those accompanying the patients from their respective buildings, were stationed in the dance area at the exit doors, in the balcony, upon the stage and at the lavatories. The doors, including that through which claimant is supposed to have passed to a hallway off the stage, were kept unlocked in accordance with fire regulations. At intervals a count was taken of the patients in each group. The attendants were required to keep watch on and, if necessary, correct the behavior of the patients while dancing and no patient was permitted to dance twice in succession with the same person. At the conclusion of the period, the patients left in the groups with which they had come and with their particular attendants.

The procedure and the rules prescribing it seem to us to have been adequate and sufficient under the circumstances. There is no evidence whatsoever that the procedure was not regularly adhered to and none that the rules were at any time relaxed. If there were satisfactory evidence that claimant and a companion escaped surveillance, momentarily at least, we could not say, even then, that the unexplained failure of the supervisory system on one occasion was sufficient to charge the State with liability in the circumstances which claimant contends existed at that time. Close confinement of all patients would minimize all hazards of the nature here involved but the result would be to the detriment of great numbers of patients whose recovery and readjustment might be aided by social intercourse and activities more closely approaching the normal life to which each should, if possible, return. Upon this record, it does not appear that the State acted unreasonably in calculating and permitting whatever risk the small measure of freedom accorded these patients entailed or that it was negligent in the promulgation and enforcement of the rules designed for their control and supervision. We conclude that claimant's recovery upon her first cause of action is not supported by a preponderance of the evidence.

The second cause of action, alleging the performance of an operation to induce an abortion, without the consent of claimant or her parents, is sustainable. Claimant's pregnancy became

known to the hospital authorities on January 7, 1953, which happened to be the regular visiting day of claimant's parents, who were told of their daughter's condition when they arrived at the hospital. The possibility of an operation was not discussed with them, then or thereafter. On the same day, the director of the hospital constituted a panel or board of three physicians, consisting of himself, the associate director and a psychiatrist assigned to the acute medical-surgical building, to determine what procedure, if any, should be taken with reference to claimant's condition. All three physicians were psychiatrists and the board did not include an obstetrician, as would have been good practice, according to the testimony. Apparently the physicians did not examine claimant but proceeded to their consultation on the basis of her medical history maintained at the hospital and in reliance upon the opinion of the physician directly in charge of her case. It was said that following the lobotomy performed some nine months before, claimant had improved but that some time after the commencement of her pregnancy her mental condition began to regress, so that on January 7 she was '' in a regressed catatonic state * * * practically refusing to eat and * * * in a very serious condition.'' One of the physicians testified that he feared she would reach a state of psychotic exhaustion from which death sometimes occurs. Upon the conclusion of their consultation the three physicians signed a statement expressing their opinion that continuation of claimant's pregnancy would threaten her improvement and '' undoubtedly revive the homicidal and suicidal trends.'' Upon the trial, Dr. Kolb, a psychiatrist not connected with the hospital but associated with another State institution, testified that in his opinion the conclusion reached was a proper one and that he would have concurred with the recommendations made. On January 8, the day following the discovery of claimant's pregnancy, the operation was performed.

Although the claim alleged, simply and sufficiently, an operation performed without consent, the decision went further and held that the operation was to induce an unlawful abortion and would not have been legalized or justified by the consent of claimant or that of her parents. This conclusion was necessarily predicated on the provisions of section 80 of the Penal Law whereby the act of inducing an abortion, unless necessary to preserve the life of the woman or of the child, is constituted a crime. The assent of the woman to a violation of the statute will, of course, afford no defense to a criminal prosecution thereunder. It does not necessarily follow that consent will not bar recovery in a civil action based on the same act. The

general test, in all cases involving acts which are made criminal by statute and at the same time give rise to civil remedies, is whether the particular statute was enacted for the protection of the interests of the public or primarily to protect the interests of a particular and limited class of persons. (1 Restatement, Torts, §§ 60, 61.) If the act was prohibited for the protection of society generally, assent will bar recovery in a civil action, but if the inhibition was to protect a limited class of individuals from their own lack of judgment, consent will be unavailing. (1 Restatement, Torts, §§ 60, 61; Prosser on Torts [2d ed.], pp. 86, 87; 86 C. J. S., Torts, § 9.) Authority exists for the inclusion of statutes prohibiting abortion in the category of those enacted, in furtherance of public policy, for the protection of society generally, with the result that consent will defeat a private cause of action. (*Miller* v. *Bennett,* 190 Va. 162 [*dictum*]; 1 Restatement, Torts, § 60; and see Prosser on Torts [2d ed.], p. 87, notes 83, 84, for opposing decisions.) It is probable that the point has not been more fully considered because the cases denying recovery where consent has been shown have generally proceeded on the ground that a plaintiff should be precluded by reason of her participation in the wrongful act. (*Herko* v. *Uviller,* 203 Misc. 108; *Larocque* v. *Conheim,* 42 Misc. 613; *Hunter* v. *Wheate,* 289 F. 604; *Szadiwicz* v. *Cantor,* 257 Mass. 518; *Miller* v. *Bennett,* 190 Va. 162, *supra.*) Nevertheless, the mere statement of this latter ground is implied recognition that the criminal statute was not designed to protect individuals lacking in the judgment which a finding of voluntary participation must presuppose. We think it fair to say that the weight of authority supports the conclusion, whether based on one of the grounds discussed or the other, that consent will foreclose recovery even if the act be criminal. Thus the trial court's determination, whether or not warranted by the evidence, that the operation was for an illegal abortion and that no consent would have justified it, should not have been decisive of the case.

Further, the determination was unnecessary to a decision. Claimant may recover in any event if the operation, whether or not illegal under section 80 of the Penal Law was performed without consent and no emergency existed. (*Schloendorff* v. *New York Hosp.,* 211 N. Y. 125.)

We are satisfied that there was no emergency. The medical expert called by the State so testified. The director of the hospital said that a week's delay would have made no great difference. He was not asked as to the effect of a longer delay.

We consider that the State was obliged, at the very least, to seek to obtain a valid consent. The hospital authorities instead did nothing although it was standard practice to obtain consent to other operative procedures, as was twice done in the case of this claimant when shock therapy and, later, a lobotomy were contemplated. With or without the co-operation of claimant's parents, whose residence was at no great distance from the hospital, application for the appointment of a committee of claimant's person could have been made immediately, by order to show cause, to the Supreme Court whose ward she was (Civ. Prac. Act, § 1356; *Sporza* v. *German Sav. Bank,* 192 N. Y. 8, 19) and should the application have been approved and the court have been satisfied of the claimed necessity for immediate action upon the medical problem, it must reasonably be assumed that the court's discretion would have been exercised to act to appoint a committee without delay, in accordance with the brief and simple procedure permitted by section 1374 of the Civil Practice Act. On the other hand, delay might have ensued, on the part of the court or on that of an appointed committee, but speculation as to that possibility is no answer to the State's failure to make any effort whatsoever, even to the extent of communicating with claimant's parents.

We deem specious, under the circumstances disclosed by this record, the State's argument that as claimant was its ward and no committee had been appointed for her it was authorized to act as seemed best for her well-being. We consider that no such right existed, in the absence of an emergency, but that, in any event, it could not properly be exercised when confided to a board of physicians so constituted as to permit possible conflicts of interest as between claimant's welfare and the reputation of the hospital administration for which at least two of the board members were responsible.

We find, therefore, that the operation was performed by the State's agents without any consent on behalf of claimant and that no emergency of a nature excusing the necessity for consent existed. Accordingly, claimant is entitled to damages for the assault and trespass thus constituted. (*Schloendorff* v. *New York Hosp.,* 211 N. Y. 125, *supra.*)

The damages awarded are, in our view, greatly excessive. The operative procedure involved no incision or open operation and was performed under anesthesia. It is not shown that claimant suffered any pain or discomfort except as she ran a fever during parts of two days and experienced pain less severe than that of normal labor for about an hour when the miscarriage later occurred. Medical testimony that her mental and

physical condition improved as a result of the termination of pregnancy was not contradicted. The award should be reduced to $2,000.

The judgment upon the first cause of action set forth in the claim should be reversed, on the law, and the facts, and the claim, as to that cause of action, dismissed. The judgment upon the second cause of action set forth in the claim should be modified, on the law and the facts, by reducing the amount of the award thereon to the sum of $2,000 and, as so modified, affirmed, with costs to respondent.

Foster, P. J., Bergan, Coon and Halpern, JJ., concur.

Judgment upon the first cause of action set forth in the claim reversed, on the law and the facts, and the claim, as to that cause of action, dismissed.

Judgment upon the second cause of action set forth in the claim modified, on the law and the facts, by reducing the amount of the award thereon to the sum of $2,000 and, as so modified, affirmed, with costs to the respondent. Settle order.