(174 App. Div. 408)

## BEEBE v. BEEBE.

(Supreme Court, Appellate Division, Second Department.   September 29, 1916.)

1. DIVORCE ⬤⇒27(18)—"CRUEL AND INHUMAN TREATMENT."
   If a wife is in the mental and physical distractions of childbirth, and
   the husband confesses to her his love for another and his proposal to
   cease their marital relations, and thereafter bases lunacy proceedings
   on the condition thereby excited, he is guilty of cruel and inhuman
   treatment.

   [Ed. Note.—For other cases, see Divorce, Cent. Dig. § 83; Dec. Dig.
   ⬤⇒27(18).

   For other definitions, see Words and Phrases, First and Second Series,
   Cruelty.]

2. INSANE PERSONS ⬤⇒26—FINDING OF INSANITY—CONCLUSIVENESS—FRAUD.
   Where the husband by his fraud and that of physicians procured a com-
   mitment of the wife as insane, she may attack it to impugn his good
   faith in their subsequent agreement for separation.

   [Ed. Note.—For other cases, see Insane Persons, Cent. Dig. §§ 35, 36;
   Dec. Dig. ⬤⇒26.]

3. DIVORCE ⬤⇒130—FRAUD—EVIDENCE—CHARGE OF INSANITY.
   Evidence held to have a tendency to show fraud of the husband in
   procuring commitment of the wife as insane.

   [Ed. Note.—For other cases, see Divorce, Cent. Dig. §§ 442–445; Dec.
   Dig. ⬤⇒130.]

4. DIVORCE ⬤⇒130—SEPARATE MAINTENANCE—CRUEL AND INHUMAN TREAT-
   MENT.
   Evidence held not to justify finding that the husband was not guilty of
   cruel and inhuman treatment.

   [Ed. Note.—For other cases, see Divorce, Cent. Dig. §§ 442–445; Dec.
   Dig. ⬤⇒130.]

5. DIVORCE ⬤⇒49(4)—SEPARATION—CONDONATION—SUBSEQUENT OFFENSES.
   Where, after cruel and inhuman treatment by the husband, there was
   cohabitation for one night only, and abandonment ensued on the next
   day, the condonation ceased, and the original offense revived, with the
   addition of abandonment, unless adjusted by subsequent mutual separa-
   tion agreement.

   [Ed. Note.—For other cases, see Divorce, Cent. Dig. § 174; Dec. Dig.
   ⬤⇒49(4).]

6. DIVORCE ⬤⇒40—SEPARATE MAINTENANCE—EFFECT OF AGREEMENT.
   Where the husband and wife made a separation agreement, it sup-
   planted any remedy the wife had for his cruel treatment and abandon-
   ment, so long as observed by the husband, but on his default, the wife
   could rescind, although, if she elected to keep the agreement, she could
   recover only under its terms and not otherwise.

   [Ed. Note.—For other cases, see Divorce, Cent. Dig. § 161; Dec. Dig.
   ⬤⇒40.]

Appeal from Special Term, Queens County.

Action by Mary E. Beebe against Silas P. Beebe.   From portions
of the judgment rendered, plaintiff appeals.   Modified and affirmed.

Argued before JENKS, P. J., and THOMAS, CARR, STAPLE-
TON, and PUTNAM, JJ.

Hector M. Hitchings, of New York City, for appellant.
John P. Everett, of New York City, for respondent.

⬤⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

THOMAS, J. The parties were married in 1896 and lived in apparent happiness until their fourth child was born on March 14, 1911, although for some months before that date the wife was concerned by defendant's abstraction, appearance of weariness or overwork, with accompanying indifference to her and the children. Several weeks before the birth of the last child, named Shaler, the defendant informed the plaintiff that they would no longer occupy the same room, and that they would have no more children. He repeated the statement a few days after the birth of Shaler. On May 6, 1911, urged by plaintiff's questioning, he indicated that the cause of his trouble, if made known to plaintiff, would provoke her censure, and on the following day, still importuned, he stated to plaintiff that he cared a "great deal for some one else," who knew of his disposition towards her and felt similarly towards him, but he disclaimed intimate relations between them. On the previous night the present parties occupied the same bed for the first time since the birth of the child. On May 10th, the defendant appeared distressed and, enforced by plaintiff, disclosed that a physician thought that she should go to a sanitarium for mental treatment, and on the following morning, May 11th, the plaintiff accompanied defendant to the locality of the depot, and on the way the defendant showed much emotion. Whether it was real or feigned, it was moved by the expectation that on that day two physicians would remove plaintiff to the insane asylum at Amityville, L. I., by virtue of an order of the judge of the County Court of the County of Queens, which was based upon the petition of defendant and a certificate of lunacy, verified by such physicians. During the afternoon of May 11th, the physicians did go to the house, and she yielded to their representation that defendant had sent them, and, after some half hour for preparation, went with them to the asylum, where she remained until June 17th, meantime receiving several visits from defendant and exchanging with him letters, some of which are returned. Some weeks before the commitment, defendant had suggested that plaintiff, with the daughter Ruth and without the infant, go to California for a year, but after her removal to the asylum a plan was made that she, with the baby and a nurse, should go to her sister in South Dakota; but the defendant consented only upon the condition that she should limit her return home to the few days necessary for preparation. It is not certain whether the visit to the West was proposed by defendant, as there is evidence that plaintiff had considered it, but it is inferable that she conceived it as a means of deliverance from the asylum, and that he accepted it on the condition of her divorcing herself from her home, as he declared to her that she could not come home or resume the old life, although during her few nights thereafter at home they shared the same bed. The plaintiff went West, but returned on August 11th, and although the defendant was not pleased, he occupied the same bed with her on that night, but on the next day left the house and did not thereafter make his home there, although he came quite often and remained overnight on a few occasions. Later, with Mr. Young, acting as lawyer for both of them, the agreement for separation was executed under date of December 11, 1911. It contemplates: (1) That

the parties shall live apart with unconstrained right of individual action; that the wife shall have the exclusive possession and control of the four children, and of their education until they severally attain the age of 14 years, with opportunity of access to them by the defendant; (3) that the defendant shall pay plaintiff $5,000 per annum in equal monthly payments, beginning December 15th, during her natural life and her observance of the agreement, for her maintenance and that of the children, as well as for their education, and that for the expenses of the children (except Doris) at college the defendant shall, upon the occasion arising, pay plaintiff the additional sum of $1,000 for four years for each child; (4) that the plaintiff shall have the effects "now in her dwelling," except books, bookcases, and desk, which defendant had selected for removal; (5) that defendant shall meet the expense of extraordinary medical treatment and insure his life for $20,000, or further sums, but that the wife shall pay the premiums; (6) that the wife does not release her dower. When the present action was begun, the defendant had been somewhat dilatory in making payments, and was so in arrears that the court found due the sum of $2,492. This action is brought: (1) For a separation on account of cruel and inhuman treatment and abandonment; (2) to recover the arrears on the contract. The court granted judgment only for the arrears, and found that the cruel and inhuman treatment had not been proven; that if it had been practiced it was prior to the agreement, and refused to find plaintiff's conclusion of law that defendant was guilty of cruel and inhuman treatment in particulars named and that he abandoned her.

[1-6] The court apparently proceeded upon the ground that the official commitment precluded a finding that defendant offended in obtaining it, and that the cohabitation on August 11th, upon her return from the West, and the agreement for separation, condoned the offense, if committed, and the subsequent abandonment. If the order for commitment be disregarded, the proof is that the plaintiff was rational, and that the defendant's action was not taken in good faith. This appears from the following circumstances: The defendant in their usual domestic life had left to her the customary charge of the children, and in the separation agreement made in the December, following the commitment to the asylum in May, he consigned the possession, uprearing, and education to the plaintiff, although in his petition in the lunacy proceeding on May 10th he had stated that she was insane, at times violent, had requested him to destroy her life; that he was "fearing for the lives of herself and children," and had referred to the certificate of lunacy, which stated that the present attack began in 1905, and other matters which I shall mention. There were two physicians who attended her at the asylum. Dr. Husik, who saw her two or three times each day, could not, after daily observation, discover any symptoms of insanity, and the defendant stated that, although the other physician, Dr. Wiltsie, was in court, he would not call him. Several of the plaintiff's acquaintances testified that she was rational in her conversation, and the nurse, who for six weeks attended upon the birth of the last child, and who saw her every hour

in the day, stated that she was rational, and the servant who accompanied plaintiff on the visit to the West testified that her acts and words were rational. Nor do I find in her testimony, her letters, or otherwise, any indications of mental disturbance other than would flow from her husband's disclosure and commitment. On the other hand, the husband confessed his passion for another woman; he obtained in March, 1911, a policy of insurance on his own life for $7,-000, payable to that woman, for which he agreed to pay an annual premium of $600, and canceled it in July, 1913; he at least inconsiderately repeated his decision to leave his wife's room and bed and to have no more children following the birth of the child; he declared to her before and while she was in the asylum that she could not come home and resume the old relations, and that she would have to live by herself. He caused her to be committed to an insane asylum on account of homicidal and suicidal tendencies of long standing. And yet, with such mad woman incarcerated, he sought "to come to some mutual understanding"; he trusted her to go far away with his child; he made an agreement with her, whereby he left her and all his children —all the family except himself—exposed to the disaster her malady might prompt. Upon the trial he was silent, and the physicians who co-operated for her commitment were not heard. And upon examining the evidence on which the order was based, and testing it by the present record, a reason for the failure to aid and advise the court of their view of the case is suggested. The petition, certificate of lunacy and order is dated May 10, 1911. The statute (section 61, art. 3, of the Insanity Law, c. 28, General Laws, enacted by chapter 545, Laws of 1896) provides:

"Such physicians shall jointly make a final examination of the person alleged to be insane within ten days next before the granting of the order. The date of the certificate of lunacy shall be the date of such joint examination."

One physician saw the plaintiff on May 7th and 8th, but she had not seen nor, before May 11th, had she conversed with the other doctor since the previous year, and the two physicians in association did not see her at any time prior to May 11th. That does not rest entirely upon the testimony of the plaintiff. The nurse, Ackerman, during the four days before plaintiff was removed to the asylum, saw one doctor upstairs, but did not see the physicians together before May 11th. If attention be given to the history disclosed by the physicians to the county judge, it will be seen that they testified that they made a joint examination of the plaintiff on May 10, 1911; that she was insane; that they formed their opinion upon facts required to be personally observed, to wit, that she inquired concerning her husband's intimacy with other women, confessed her insane jealousy, stated that her father had died of grief, whereas he died of insanity, and under the heading, "State what the patient did in presence of the examiners, and also describe his or her appearance and manner," it was said:

"Patient stood and talked in suppressed tones and seemed to be laboring under excitement sexual. She has requested her husband to kill her. She has

concealed the means of destroying her own and the children's lives, and has said that her husband would be better off if she and the children were dead."

There are other statements not purporting to be within the personal knowledge of the physician relating to her depression, excitability, outbursts of violent temper, unreasonably hard treatment of her children, and neglect of their training and the invariable subject of her conversations. The certificate also advises the court, but not on personal knowledge of the physicians, that she had insane relatives, father, brother, and two cousins on the mother's side. Such portrayed victim of a sexual passion so extreme as to impair her reason and endanger her children was, in the following August, sent adrift by her husband, burdened by all the parental cares and duties save that of support. The plaintiff says that her father died of cancer, and, so far as the court would permit, gave evidence tending to show that the statements made by the physicians were not true in fact, and that she had not made the statements ascribed to her, except to one physician that her "father was out of his mind at the time that he died," and to defendant, after the revelation of the other woman:

"When he said that to me, among other things, I said that I wished that I had died before the baby was born. Then I was afraid I might die. Now I wished I had, and that I might never have lived to hear it; why didn't he, when he had the chloroform in his hand, finish off the job."

If the plaintiff was insane, the husband banished her from his presence and personal care and placed the children at the hazard of her frenzy, and contracted with her as if she was in full mental capacity. If she was a woman in the mental and physical distractions of childbirth, and he superadded his confession of love for another, and his proposed disposition of the marital relations, and based his lunacy proceedings on the condition he had excited, he was cruel and inhuman. But he shields himself behind the order in the lunacy proceedings. That should not be allowed. He contends that it is a judgment establishing the insanity, and that it cannot be attacked even to impugn the good faith of the defendant, and for this he cites Sporza v. German Savings Bank, 192 N. Y. 8, 84 N. E. 406, where the commitment was concededly lawful, and People ex rel. Reiblich v. Waldo, 162 App. Div. 417, 419, 147 N. Y. Supp. 286, where the commitment was not attacked; and it is urged that the commencement of the proceedings and commitment to an asylum are not grounds for a limited divorce, which was not decided in Kuster v. Kuster, 37 Misc. Rep. 136, 74 N. Y. Supp. 853, although for that cited. But the evidence tends to show that the lunacy order was obtained by defendant's fraudulent practice. The physicians did not jointly examine the plaintiff, and one of them had not seen her during the year 1911. But such joint examination is one of the grounds of jurisdiction, and a person knowingly omitting compliance with it cannot plead the protection of the order. The defendant instituted the proceeding, and used the certificate of lunacy for that purpose. He, the instigator of the proceedings and presenting the certificate, knew whether the two physicians had, on May 10th, made a joint visit to his house and conducted a joint examination of

his wife with the result stated in the certificate, and he must have known that his application was false and fraudulent. It, therefore, is not unassailable as to him, whatever evidence of insanity it might otherwise be. I think, therefore, that the court was not justified in finding that the defendant had not been guilty of cruel and inhuman treatment.

The cohabitation on August 11th, when plaintiff returned from the West, if condoning, ceased to be such by the abandonment on the next day, for that revived the offense and added another, and the court should have found both, unless they were adjusted, at least conditionally, by the separation agreement. In my judgment, the agreement, so long as defendant kept it, took the place of any remedy the plaintiff would otherwise have for cruel treatment or abandonment. Winter v. Winter, 191 N. Y. 462, 84 N. E. 382, 16 L. R. A. (N. S.) 710; Hungerford v. Hungerford, 161 N. Y. 550, 56 N. E. 117; Galusha v. Galusha, 138 N. Y. 272, 33 N. E. 1062; Johnson v. Johnson, 206 N. Y. 561, 100 N. E. 408, Ann. Cas. 1914B, 407. This case was before the court in October, 1913, upon an order awarding alimony and counsel fees, 158 App. Div. 948, 143 N. Y. Supp. 1106. It was the view of this court that a cause of action for a separation was stated, but, while not deciding whether another cause of action was united, it was considered that the separation agreement, while it remained intact, limited the amount of the alimony. That conclusion was based on the decision in Galusha v. Galusha, supra, where the offense that justified absolute divorce was after the separation agreement, while that remained in force. The separation agreement exists, and the plaintiff seeks to enforce it and to recover the arrears. The defendant was in default, and the plaintiff could have rescinded it, but preferred to keep it alive, and it is in full force. But if plaintiff confirms it for one, she must for all purposes. It affected at least two things: It assured her all the rights that could accrue from a judgment of separation; it promised her means of support for herself and her infant children, which takes the place of alimony. The plaintiff now asks that for the agreement for separation, which she keeps in esse, there be substituted a judgment for separation, and that the sum stipulated for her support become alimony and enforceable as such. I perceive no legal justification for such use of the agreement for a purpose for which it was not intended. The plaintiff had her choice of the judgment of the court or agreement. She preferred the latter, and, quite competent to contract, made an agreement that for fairness is not justly attacked. While she avails herself of her separation and support by agreement, she should not have the same relief by action.

The finding that the defendant has not been guilty of cruel and inhuman treatment should be reversed, and it should be found that he was guilty of such treatment, which was condoned by the cohabitation on August 11, 1911, revived by the abandonment on August 12th and thereafter, but composed by the agreement for separation. The findings should be modified so as to state that the defendant was guilty of cruel and inhuman treatment and abandonment, the condonation and the adjustment thereof by agreement. The provision in the judgment

that the defendant shall pay the amount due on the agreement is open to the construction that payment thereof is ordered, whereas the judgment should be limited to the recovery thereof. The judgment, modified accordingly, should be affirmed, without costs.

JENKS, P. J., and CARR, and STAPLETON, JJ., concur. PUTNAM, J., not voting.

<hr>