*679 OPINION OF THE COURT
Michael D. Stallman, J.
At issue is the scope of the jury’s role in a rehearing and review proceeding concerning the continued involuntary retention of a civilly committed psychiatric patient.
FACTS
Petitioner is a long-term, civilly committed mental patient, currently under involuntary in-patient treatment at the Kirby Center, a high security State psychiatric hospital. Petitioner was administratively transferred from a nonsecure mental hospital to a secure facility in 1992, pursuant to 14 NYCRR part 57.[1] Petitioner, who did not challenge, and does not here challenge the transfer, has already had two judicial retention hearings, in which the Justices found, inter alia, that he was still mentally ill and in need of retention.
In this proceeding, petitioner seeks a rehearing and review (Mental Hygiene Law § 9.35) of the most recent retention order. The State moves for partial dismissal of the request for a trial de novo on the issues of the patient’s dangerous mental disorder and the need for his retention in a secure facility, and of the petitioner’s request for transfer to a nonsecure State psychiatric hospital. In his moving affidavit, petitioner asserts that he does not suffer from a dangerous mental disorder and does not need retention in a secure facility; and that he is not mentally ill or in need of retention in any facility.
I
Mental Hygiene Law § 9.35, applicable to all involuntarily confined psychiatric patients, provides that any such person "who has been denied release” may seek a "rehearing and review” before a different Justice and a jury. "Such justice shall cause a jury to be summoned and shall try the question of the mental illness and the need for the retention of the patient so authorized to be retained * * * If the verdict of the jury * * * be that such person is not mentally ill or is not in need of retention, the justice shall forthwith discharge him, *680 but if the verdict of the jury * * * be that such person is mentally ill and in need of retention the justice shall certify that fact and make an order authorizing continued retention.”
New York common law has long recognized the practice of using juries to inquire into the mental illness of persons subject to incompetency proceedings and involuntary commitment to mental institutions. Although resort to a writ of habeas corpus was always available, the usual practice dating back to British times was for the alleged "lunatic” to obtain a writ de lunático inquirendo, which required that a jury be summoned to inquire if the person had a mental disorder that required confinement or deprivation of control over property. (See, Sporza v German Sav. Bank, 192 NY 8.) The purpose of the jury verdict was to inform the court’s conscience — i.e., it was an advisory verdict. (See, Sporza v German Sav. Bank, supra; Matter of Tracy, 1 Paige 580; Matter of Mason, 1 Barb 436.)
The first State Constitution declared: "trial by jury, in all cases, in which it hath heretofore been used in the colony of New-York, shall be established, and remain inviolate forever.” (NY Const art XLI [1777].) This provision appeared in substantially the same form in all 19th century Constitutions. (NY Const, art VII, § 2 [1821]; art I, § 2 [1846]; art I, § 2 [1894].) The current provision guarantees a jury trial "in all cases in which it has heretofore been guaranteed by constitutional provision”. (NY Const, art I, § 2 [1938].) In Sporza (supra, at 17), the Court of Appeals held that from the time this constitutional provision was first enacted, "the custom prevailed on the part of the chancellor, in order to inform his conscience, to require a trial by jury on the question of insanity”. The Court recognized that this advisory practice thereby became a constitutional right.
Jury trial on the issue of the "fact of the lunacy” became a statutory right in 1842, in substantially the current form. (L 1842, ch 135.) A certificate signed by two physicians triggered a hearing in court. If the person adjudged lunatic was dissatisfied with the result, he could petition one of the Judges of the county to call a jury to determine the fact of the lunacy, i.e., the issue of the person’s mental illness and need of retention. This basic statutory procedure has continued in subsequent re-codifications,[2] including current Mental Hygiene Law § 9.35. In the 1972 recodification of the Mental Hygiene Law, the *681 Legislature refined the jury question to the current form: mental illness and the need for retention. (L 1972, ch 251, § 31.35.)
II
Petitioner asserts that Mental Hygiene Law § 9.35 is merely a procedural vehicle, intended only to implement the right to a jury trial. He further argues that former criminal defendant-insanity acquittees are entitled to jury review of all issues under CPL 330.20, including that of dangerous mental disorder and the need for secure retention, or transfer to a nonsecure, civil mental hospital if the jury finds the patient no longer dangerous; and that equal protection requires that civilly committed patients like himself should have the same right to such a broad jury review. Petitioner’s premises and conclusions are incorrect.
The plain text of Mental Hygiene Law § 9.35 demonstrates that it is much more than a procedural mechanism. Rather, it specifically delimits the scope of jury review to "mental illness” and the "need for retention”.
"Dangerous mental disorder” and "secure facility” are terms of art defined by the Criminal Procedure Law. (CPL 330.20 [1].) They were adopted as an integral part of the three-tier post-trial classification procedure adopted in 1980 for insanity acquittees, i.e., criminal defendants found not responsible by reason of mental disease or defect. (L 1980, ch 548; see, Matter of George L., 85 NY2d 295.) These CPL terms, and the classification standards and procedures to which they relate, do not exist under the Mental Hygiene Law. They do not relate to the Mental Hygiene Law definition of "mental illness” or the Mental Hygiene Law standard for retention of a civilly committed, non-CPL 330.20 mental patient. They are inapplicable to the case at bar.
Mental Hygiene Law § 1.03 (20) defines "mental illness” as: "an affliction with a mental disease or mental condition which is manifested by a disorder or disturbance in behavior, feeling, *682 thinking, or judgment to such an extent that the person afflicted requires care, treatment and rehabilitation.”
A civilly committed mental patient can be involuntarily retained, if "care and treatment * * * in a hospital is essential to such person’s welfare” and if the patient’s "judgment is so impaired that he is unable to understand the need for such care and treatment.” (Mental Hygiene Law § 9.01.) Case law has imposed an additional due process-required element: The patient must continue to pose "a substantial threat of physical harm to himself or others;” such harm could result from, e.g., the patient’s failure to meet essential needs for food, clothing or shelter, or to perform the commonly understood activities of daily living. (Matter of Harry M., 96 AD2d 201, 208; see, Matter of Boggs, 132 AD2d 340, appeal dismissed 70 NY2d 972; Project Release v Prevost, 722 F2d 960 [2d Cir].) This kind of "dangerousness” need not involve violent, aggressive or criminal behavior or ideation; it would not necessarily constitute the current physical dangerousness which is an element of a dangerous mental disorder under the CPL. (Cf., Matter of George L., supra.)
In contrast, while the CPL 330.20 definition of dangerous mental disorder incorporates by reference the Mental Hygiene Law definition of mental illness, it also requires a finding of current physical dangerousness under a different standard than the civil commitment standard discussed supra. (CPL 330.20 [1] [c].) In a CPL retention hearing, proof of the elements of a dangerous mental disorder alone suffices to require secure retention. Under the CPL, the result follows automatically from the adjudication of the status. In a civil commitment case, both mental illness, and the above-enumerated elements of involuntary civil retention, must be proven.[3] The issues of "dangerous mental disorder” and "secure retention” are inapplicable to a non-CPL patient and are thus not in issue in the Mental Hygiene Law § 9.35 retention proceeding; a fortiori, they are not subject to determination by a jury in a rehearing and review proceeding.
*683 The incorporation by reference in CPL 330.20 (16) of the Mental Hygiene Law § 9.35 rehearing and review provision means that a CPL patient’s right to a jury trial is no greater than that of a civilly committed Mental Hygiene Law patient. (CPL 330.20 [17]; see, Matter of Daniel R. v Wack, 167 Misc 2d 74, and cases cited therein.) Because the issues of "dangerous mental disorder” and "secure retention” are not jury issues in a Mental Hygiene Law rehearing and review, and given the CPL language and legislative history, they are not jury issues in a CPL rehearing and review. (Matter of Daniel R. v Wack, supra.) Since CPL patients lack the broad right to jury review that petitioner incorrectly hypothesizes they have, and since petitioner mistakenly assumes that the same standards should, and do apply to both CPL and Mental Hygiene Law retention hearings, his argument lacks logic and merit. Petitioner’s reliance on cases concerning retention of insanity acquittees, particularly those predating the 1980 adoption of current CPL 330.20, is unpersuasive.
Ill
Petitioner urges that constitutional considerations of due process and equal protection require interpretation of the statutory framework as permitting jury review of dangerous mental disorder and need for secure retention. Petitioner mistakenly relies on, inter alia, Baxtrom v Herold (383 US 107 [1966]) and People v Lally (19 NY2d 27 [1966]).
Baxtrom (supra) concerned a New York prison inmate who was diagnosed as mentally ill while serving his prison sentence and then transferred to a prison mental hospital. The State successfully brought a proceeding for civil commitment upon expiration of the sentence, but after prison authorities determined that the patient was dangerous, he was retained in the prison hospital. The United States Supreme Court held that Baxtrom’s continued confinement denied him equal protection (US Const 14th Amend) on two grounds. First, the State denied him the jury review available to all others civilly committed; second, the State kept him in a secure institution without a postsentence judicial determination of his dangerousness. The Court declared: "Classification of mentally ill persons as either insane or dangerously insane of course may be a reasonable distinction for purposes of determining the type of custodial or medical care to be given, but it has no relevance whatever in the context of the opportunity to show whether a person is mentally ill at all. For purposes of granting judicial *684 review before a jury on the question whether a person is mentally ill and in need of institutionalization, there is no conceivable basis for distinguishing the commitment of a person who is nearing the end of a penal term from all other civil commitments.” (Baxtrom v Herold, supra, at 111-112.) The Court clearly recognized the limited scope of jury review under New York law and its constitutionality, as well as the appropriateness of the Judge, not the jury, differentiating between dangerous and nondangerous patients and determining where they should be confined.
People v Lally (19 NY2d 27 [1966]) confronted the Court of Appeals with a challenge to former Code of Criminal Procedure § 454, the predecessor insanity acquittee statute to CPL 330.20. Unlike CPL 330.20, Code of Criminal Procedure § 454 did not provide for a rehearing with a jury. Writing several months after Baxtrom (supra), the Court of Appeals sustained constitutionality: "[T]o provide defendant [the insanity acquit-tee] with protection equal to that of other persons under the New York State statutes as to adjudications of mental incompetency we may and do read into [the existing Code of Criminal Procedure § 454] * * * a provision for a jury trial of these issues”. (People v Lally, supra, at 35.) "These issues” mean the issues before the jury at an incompetency hearing.[4]
The right to due process attaches whenever State action deprives an individual of a recognized liberty interest. (US Const 14th Amend; NY Const, art I, § 6.) The liberty interest that triggers jury review is the basic human right of an adult to live autonomously, free of forced institutionalization. (See, Baxtrom v Herold, supra; Addington v Texas, 441 US 418, supra.)
While any aspect of an involuntary mental patient’s care can be viewed as affecting the patient’s liberty interest, due *685 process does not require jury review, or even a fixed level or type of procedural review, in every case. Rather, it requires an opportunity to be heard appropriate to the circumstances.[5] In some situations, due process requires a formal judicial hearing, but does not require a jury trial or review. (E.g., Rivers v Katz, 67 NY 485 [hospital’s application for involuntary medication].) Patients can challenge certain administrative decisions (e.g., civil administrative transfer from nonsecure to secure facilities under 14 NYCRR part 57) by available administrative procedures, and judicially, by CPLR article 78 proceedings, where there is no right to jury review. (See, Matter of Jerome G., 201 AD2d 562.) Indeed, in many situations, due process does not require any judicial hearing. (See, Project Release v Prevost, 722 F2d 960 [2d Cir 1983], supra.)
While the Supreme Court has broad jurisdiction to protect and supervise treatment of committed mental patients (see, Rivers v Katz, supra) and does so by procedures that do not carry a right to'jury review, it may not micromanage patient care. (Matter of Chenier v Richard W., 82 NY2d 830 [error to attach treatment-related conditions to retention order].) The right to jury review has never extended to changes in levels of care, treatment, classification or supervision based on dangerousness, response to treatment or prognosis, once it has been determined that the patient must be confined in a mental institution. To define liberty interests in this context as the petitioner requests would cause the right to a jury trial to attach whenever the hospital increases, or the patient challenges, the level of security and control. No constitutional principle requires that result.[6]
*686 When the statutory evolution is examined, in light of the case law, several basic principles are readily apparent. The common-law Judges believed that a jury trial was "proper * * * before [a person] is deprived of his property or his liberty, either by his misfortune or his fault.” (Matter of Tracy, 1 Paige 580, 582, supra.) More recent cases analyzed this threshold question in due process terms as the liberty interest to which the right to a jury attaches. The statutes have always limited the issue for jury consideration to the existence of the mental illness and the need for involuntary institutionalization or the need for appointment of a personal representative to control the person’s property. (Cf., Mental Hygiene Law art 81 [adult guardianship].) The statutes did not expand the scope of the jury’s inquiry, but converted what began as a common-law advisory practice into a right to have a jury decide the limited issues. The current statutory scheme is thus constitutional as written.
Jury rehearing and review of a non-CPL patient’s civil commitment necessarily embraces all elements required for civil retention, including the element of the threat of physical harm. It does not extend to the efficacy or comparative merit of different types or places of treatment, once the jury has determined the liberty interest that triggers the right to jury review — the existence of mental illness and the need for retention (i.e., involuntary confinement).
The relative degrees of dangerousness among committed mental patients, and the levels of security appropriate under the circumstances, are not the kind of issues traditionally determined by juries. No constitutional principle compels a departure from this view.
Transfer from a secure facility to a nonsecure psychiatric hospital is not a question under Mental Hygiene Law § 9.35. When Mental Hygiene Law § 9.35 refers to "a person * * * whose * * * transfer and continued retention has been authorized”, it does not mean transfer from or to a secure facility. Rather, as the Mental Hygiene Law article 9 judicial hearing provisions make clear, "transfer” in this statutory context *687 refers only to a judicial order moving a patient from either a general hospital or psychiatric hospital operated by a State subdivision to either a State psychiatric hospital, a private psychiatric hospital or the patient’s family or guardian. (Mental Hygiene Law §§ 9.31, 9.33.)[7] Whatever the patient’s right to judicial review of the hospital’s denial of a request for transfer to an ordinary civil institution (a matter not in issue here), jury review does not attach.
IV
Finally, petitioner incorrectly argues that CPLR 4102 entitles him to a jury trial on any question of fact. CPLR 4102 permits a party to demand a jury only if there is an independent right to a jury trial — either in one of the causes of action listed in CPLR 4101 (1) or (2), or where such a right has been granted by Constitution or other statutory provision. (CPLR 4101 [3]; see, Siegel, Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR 4102:1, at 210.) The issues of dangerous mental disorder and secure retention, as framed by petitioner, do not fall into either category.
V
Petitioner’s request, in the order to show cause in lieu of notice of petition, for an order appointing an independent psychiatrist, is denied. Petitioner does not allege a basis for appointing an independent examiner; indeed, the moving affidavits and memorandum of law do not address this issue. Appointment of an independent psychiatrist is intended to provide an additional impartial expert to aid the court’s determination. It is not intended to provide a partisan expert witness for one side or the other. It is not available merely for the asking. Like any other request for affirmative relief, especially one that would incur public expense, it must be supported by adequate proof of entitlement by the movant.
CONCLUSION
The scope of the jury question in this rehearing and review proceeding is limited to the issues of the patient’s mental illness and the need for retention. Accordingly, the State’s motion to dismiss is granted, in part, only to the extent of limiting the jury issues as indicated, and otherwise denied.

. 14 NYCRR part 57 provides an administrative mechanism whereby involuntarily committed mental patients can be transferred from ordinary, nonsecure mental institutions to secure facilities if "there is a substantial risk that such patient may cause physical harm to other persons, as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious harm.” (14 NYCRR 57.2 [1].)

. In 1874, the right was extended to all mental patients in both private and public institutions with no change in the wording of the jury issue. (L 1874, ch 446, § 11.) The Insanity Law of 1896 framed the issue for the jury trial as "the question of such insanity in the same manner as in proceedings *681 for appointment of a committee”. (L 1896, ch 545, § 63.) The 1909, 1927 and 1933 statutes each framed the issue as "the question of the insanity of the person so committed” and equated it with the factual question of competency for the jury in incompetency cases. (L 1909, ch 155; L 1927, ch 426, § 73; L 1933, ch 395, § 74.) The "heretofore used” language of each of the pre-1938 Constitutions appears to have incorporated, as a State constitutional right, the then-existing statutory right. In 1944, the Legislature substituted "mental illness” for "insanity”, but neither expanded the scope of the jury question nor substantially altered the procedure. (L 1944, ch 666, § 33.)

. Retention of a non-CPL patient requires a lower level of dangerousness, and one different in nature, from the CPL 330.20 (1) (c) (ii) "current physical danger” element of dangerous mental disorder. However, the standard of proof in a non-CPL retention case is higher than in a CPL case. A non-CPL case such as this requires that the State prove its case by clear and convincing evidence. (Addington v Texas, 441 US 418.) A CPL case requires proof by a preponderance of the credible evidence. (Matter of George L., 85 NY2d 295, 303, supra; People v Escobar, 61 NY2d 431; see, Jones v United States, 463 US 354.)

. Earlier in the same paragraph, the court framed the issues for the hearing on remittitur as including both discharge and dangerousness, but did not indicate which issue was for the court and which for the jury. Even if read as petitioner does, as extending the scope of the jury review, it must be regarded as obsolete and uncontrolling, and indeed, far broader than that required by Baxtrom (supra). An awkward example of judicial legislation to save a statute, it was subsequently repealed by the passage of CPL 330.20 with its inclusion of the Mental Hygiene Law § 9.35 limitation of jury review. Moreover, the United States Supreme Court subsequently recognized that insanity acquittees are a distinct classification not similarly situated from noncriminally involved mental patients; different procedures are therefore constitutionally acceptable. (Jones v United States, 463 US 354, supra; see, Matter of Evans, 143 Misc 2d 979.)

. How much process is due (i.e., the type of procedural review), as well as the ultimate permissibility of the challenged State action, depends on a careful balancing of interests. The nature of the affected liberty interest and the extent of its deprivation must be balanced by the nature of the State’s interest, and the State’s consequent need to control the liberty interest. The particular deprivation of a mental patient’s liberty interest must relate to both the State’s parens patriae power to protect persons incapable of exercising judgment, even against their wishes, and the State’s need to protect public safety through the police power. (See, Project Release v Prevost, 722 F2d 960, supra.)

. Matter of Kesselbrenner (33 NY2d 161, 165), relied on by petitioner, does not concern entitlement to a jury trial. The Court of Appeals there held unconstitutional a statute repealed while the appeal was pending. The former statute, unlike current law, permitted administrative transfer of a noncriminal mental patient from a civil hospital to a prison psychiatric hospital operated by the Department of Correctional Services. The Court held the for *686 mer statute violated due process because it subjected the patient to a "greater deprivation of personal liberty than necessary to achieve the purpose for which he is being confined”. In contrast, the current statute, and the current standard for civil retention, with its opportunities for judicial review, is not unconstitutional under Kesselbrenner. Moreover, the Kirby Center under the current law is operated by the Office of Mental Health. It provides treatment in a hospital setting, albeit with a high degree of security commensurate with the needs of its patient population and public safety.

. In contrast, CPL 330.20 (1) (1) defines a transfer order as one directing transfer from a secure facility to a nonsecure facility. That definition is not applicable to a non-CPL, civilly committed patient such as petitioner.